[Cite as *In re Guardianship of Keane*, 2020-Ohio-1105.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## CARROLL COUNTY

IN THE MATTER OF:

GUARDIANSHIP OF JAMES KEANE

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 19 CA 0934**

---

Civil Appeal from the
Court of Common Pleas, Probate Division, of Carroll County, Ohio
Case No. 20182013

**BEFORE:**
David A. D'Apolito, Gene Donofrio, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Laura Mills,* and *Atty. Jacquelyn McCloud,* Mills, Mills, Filey & Lucas, LLC, 101 Central Plaza South, Suite 1200, Canton, Ohio 44702, for Plaintiffs- Appellants and

*Atty. Maureen Stoneman,* Stoneman Law Office Co., LPA, 63 Second Street South West, P.O. Box 326, Carrollton, Ohio 44615, for Defendant-Appellee.

Dated: March 23, 2020

**D'APOLITO, J.**

**{¶1}** Appellants Joyce Keane, Jane (Keane) Filimon, (2), Joan (Keane) Bracken, Jim Keane and, Vicki Keane (Jim's wife), all of whom filed applications for guardianship of their father/father-in law, James P. Keane (D.O.B. 9/18/1940), appeal the decision of the Probate Division of the Carroll County Court of Common Pleas appointing Mr. Keane's second-youngest daughter, Josette Folk (5), as the guardian of his person, and appointing Josette as co-guardian, with Joyce, of his estate. Appellants allege that the probate court's appointments of Josette violate Ohio guardianship law and are not in Mr. Keane's best interest.

**{¶2}** After expressing skepticism regarding all five of the applicants (Jim conceded at the hearing that Vicki was the better choice between the two of them, because Jim's work required considerable travel), the probate court placed several conditions on the newly-appointed guardians to safeguard Mr. Keane and his assets:

• Mr. Keane must undergo a physical and mental re-evaluation every six months to determine if his best interests are being met, and his opinion regarding his best interest should be considered, but should not be determinative;

• The co-guardians of the estate must be bonded;

• The beneficiary designation in Mr. Keane's annuity must be amended, from Joyce and Jane, to all thirteen of his children; and

• Mr. Keane's children are prohibited from borrowing money from him in the future.

(7/8/19 J.E., p. 2).

**{¶3}** Because the probate's court authority to appoint a guardian in not limited by the designation of a guardian in a previous power of attorney, and the record supports Josette's appointments, with the additional conditions, we affirm the judgment of the probate court.

<u>Case No. 19 CA 0934</u>

## FACTS AND PROCEDURAL HISTORY

{¶4} The following facts are taken from the testimony offered at the hearing on guardianship conducted on April 30, 2019 and May 10, 2019, as well as the exhibits admitted at the hearing. The parties stipulated that Mr. Keane, who fathered thirteen children, is incompetent. He did not attend the hearing.

{¶5} Each of the applicants testified on their own behalf. In addition, Julie Shockey, Mr. Keane's youngest child, testified on behalf of Josette. Likewise, the principal at the middle school where Josette is employed as a physical education teacher, and Josette's team teacher both attested to her fitness for the role of guardian. Jim (Vicki's husband) and Joshua Keane testified on behalf of Vicki. Amy Newsome, Mr. Keane's part-time caregiver also testified at the hearing.

{¶6} Four of Mr. Keane's children, Jeanette Steiner, Jamie LaRoy, Gerald Keane ("Jerry"), and Jason Keane supported the guardianship application of Josette, but did not testify at the hearing. Two of Mr. Keane's children, Jeff Keane and Jennifer Hankins did not participate in the guardianship proceedings.

{¶7} According to all accounts, the Keane family lived in harmony until February 22, 2018, when Mr. Keane developed encephalopathy as a result of a gastrointestinal virus and a respiratory infection which caused hypoxia. Mr. Keane became confused and disoriented while driving and ultimately lost his way to Julie's house the day he was hospitalized. His physical symptoms included chest congestion, dehydration, vomiting, and diarrhea, and, as a consequence, he required a brief hospitalization then a two-week stay in a rehabilitation facility, Aultman Woodlawn ("Woodlawn"), to regain his strength.

{¶8} At the time of Mr. Keane's hospitalization, Jane was his healthcare power of attorney and Joyce was his financial power of attorney. Joyce, who is an accountant, had been Mr. Keane's financial power of attorney since October 28, 2004. She had balanced her parents' checkbook and prepared their taxes for thirty years, long before Mrs. Keane's death roughly eleven years before Mr. Keane was hospitalized. Jane had been Mr. Keane's healthcare power of attorney since 2015.

{¶9} According to Jim's testimony, Josette did not agree that Mr. Keane required hospitalization. Josette has a Master's degree in kinesiology, the study of body

mechanics. Jim's testimony was corroborated by a lengthy text message from Josette to her siblings dated February 22, 2018, the night Mr. Keane was hospitalized.

{¶10} Josette began "[Mr. Keane] does not think today was a big deal and I agree." She explained that she spoke with Mr. Keane six times a week, and Julie and Jeanette and their families visited him once a week. Josette observed that all of the children and grandchildren should pick one day a month to visit Mr. Keane with a warm plate of food, because his only problem was loneliness.

{¶11} The text concluded, "If you would like to pencil in a day that works for you to visit each month let me know and we can set something up so we do not overwhelm him but instead spread out the love and fellowship." Appellants conceded that they did not respond to the text or undertake any effort to participate in Mr. Keane's care.

{¶12} So began the text communications that serve in large measure as the only connection between Josette, and, as a result, Mr. Keane and Appellants. When asked at the hearing if she made any effort to mend the fracture currently existing between Mr. Keane and his estranged children, Josette plainly stated that she had no intention of attempting to reconcile their relationships while the guardianship proceedings were ongoing.

{¶13} Mr. Keane's mother suffered from dementia. Mr. Keane was diagnosed with the condition and prescribed Aricept by his neurologist in 2016. According to Josette, Aricept was discontinued by Mr. Keane's gastroenterologist due to side effects. When Mr. Keane was admitted to the hospital, Appellants were distressed to learn that he was no longer taking Aricept, which was re-prescribed for him at Woodlawn.

{¶14} Notes dated February 27 and 28, 2018 from Woodlawn reflect that Mr. Keane was forgetful, particularly in the short term, and would likely forget to take his daily medication. Cognitive testing was recommended, as well as 24-hour care upon discharge. However, Jane told the representative at Woodlawn that not all of the children were "on board" with the cognitive concerns.

{¶15} Mr. Keane was adamant about returning to his own residence after he was discharged from Woodlawn. However, accordingly to both Jim and Jane, Mr. Keane ultimately agreed to live with Jim and Vicki, even if only for a short time, after he was discharged from Woodlawn. While Mr. Keane was at Woodlawn, structural changes were

made to Jim's residence in order for Mr. Keane to reside with Jim and Vicki when Mr. Keane was discharged. A room was enclosed to provide Mr. Keane with his own bedroom and bathroom, and grab bars were installed in the shower stall and near the toilet.

{¶16} Jim and Mr. Keane were very close prior to his hospitalization. Jim had worked with Mr. Keane, and mowed the lawn and performed odd jobs at Mr. Keane's residence through the years. Jim testified that he did not visit Mr. Keane at Woodlawn after convincing him to reside in Jim and Vicki's home. Jim explained that he was busy renovating his home for Mr. Keane's arrival. Josette testified at the hearing that Jim was Mr. Keane's favorite child "until Woodlawn."

{¶17} Notes dated March 8-9, 2018 from Woodlawn indicate that Mr. Keane's encephalopathy was clearing, his dementia was not severe, and he was capable of making decisions regarding his transition planning. More specifically, Gregg A. Martin, PhD, examined Mr. Keane on March 2, 2018, and concluded that he suffered from mild chronic progressive vascular dementia. Dr. Martin recommended cognitive therapy after Mr. Keane's encephalopathy had cleared.

{¶18} There is no dispute that Mr. Keane was very angry that his discharge had been delayed due to the disagreement between two factions of his children regarding where he would reside following his discharge. One faction insisted that Mr. Keane reside with Jim and Vicki. The other faction agreed with Mr. Keane that he should return to his own home with 24-hour supervision.

{¶19} Notes from Woodlawn establish that a representative of the facility explained to Jim that "the patient should be a part of the planning and decision making as he is able to make decisions for himself at this time." When Jim expressed concern about the cleanliness of Mr. Keane's home and its general habitability, the representative assured him that Woodlawn would visit the residence in order to determine that it was safe, which would allow Mr. Keane's therapists to work with him in his preferred surroundings.

{¶20} On March 10, 2018, shortly before Mr. Keane was discharged from Woodlawn, and with no notice to Jane, Mr. Keane revoked Jane's healthcare power of attorney and designated Josette in Jane's stead. Mr. Keane also demanded that Joyce relinquish his checkbook when he returned home.

{¶21} The discharge instruction from Woodlawn recommended physical therapy, occupational therapy, and speech therapy, as well as visits from a registered nurse. Mr. Keane was discharged on March 11, 2018, and he returned to his own home. According to Josette, Jason, who did not testify, resided with him for six weeks. According to Vicki, Jason stayed with Mr. Keane "maybe for a week or two."

{¶22} The home care assessment performed by a Woodlawn employee on March 22, 2018 established that there were no home environment or safety concerns, the home was neat and clean, and that Mr. Keane had a medical alert button. Area rugs were removed from the home, so as not to interfere with Mr. Keane's use of his walker, and grab bars were installed in areas where stability was a concern. A hospital bed was placed in his bedroom.

{¶23} Mr. Keane received therapy at home and was successfully discharged from the physical and occupational therapy programs. With the exception of driving an automobile, all of Mr. Keane's physical goals were achieved.

{¶24} When Joyce was Mr. Keane's medical power of attorney, she maintained a notebook in his home available to all of his children to review, which documented his doctor visits and contained a diary of his general health. The children were encouraged to add entries in the notebook reflecting any concerns they had regarding Mr. Keane's physical and mental capacity (forgetfulness, irritability) during a visit.

{¶25} Appellants testified that there was no similar practice by Josette, and, further, that Josette intentionally isolated Mr. Keane from them. Joan testified that Josette's poor communication has caused friction between Mr. Keane and his children. Josette testified that she still maintains a folder containing information about Mr. Keane's care.

{¶26} Appellants testified that Josette required that her siblings schedule appointments well in advance (two weeks in advance according to Joan) when they planned to visit their father. Josette explained that her intention was to prevent several family members from visiting Mr. Keane at the same time, because noise and overstimulation induced stress in Mr. Keane. She explained that a regular schedule was essential to his well-being, and, as a consequence, groups of visitors and impromptu plans should be avoided.

**{¶27}** Josette hired Amy Newsome in June of 2018 to assist Mr. Keane several days a week. Appellants questioned Josette's choice of Newsome to be Mr. Keane's caregiver, because she is not a registered nurse or State Tested Nursing Assistant. Josette explained that Newsome was not hired to provide medical care, but, instead, demonstrated an immediate rapport with Mr. Keane and was hired as a companion.

**{¶28}** Newsome visited Mr. Keane roughly four hours in the morning from Tuesday through Friday, and on Sunday afternoons. She made certain that Mr. Keane took his medication and she performed light housekeeping duties. She assisted Mr. Keane with his personal care and chauffeured him into town to shop for groceries and to have lunch at his favorite restaurant. Jeanette and her husband Scott visit Mr. Keane on Saturday mornings. Scott takes Mr. Keane to church every Saturday.

**{¶29}** Newsome testified that she communicates information regarding Mr. Keane's daily care to Josette, Julie, Jeanette, and Scott. Newsome further testified that Mr. Keane has a good relationship with those four children, and that she has never witnessed Josette isolate her father from the others. Newsome, who Josette characterized as Mr. Keane's confidante, stated that Mr. Keane had told her that he does not want to talk to the other children because of the guardianship proceedings.

**{¶30}** According to her testimony, Newsome cooks for Mr. Keane on Thursdays for the entire week and typically prepares and refrigerates spaghetti, sloppy joes, soup, and vegetables. Mr. Keane's neurologist recommended a high protein, low fat, low carbohydrate diet, and thirty minutes of exercise every other day. Mr. Keane owns a stationary bike, but uses it only a few minutes at a leisurely pace.

**{¶31}** Julie is Mr. Keane's youngest child and visits him once a week. She testified that, among Mr. Keane's children, his relationship with Josette is the closest. Julie further testified that Mr. Keane is fully capable of deciding the children with whom he wants to communicate. She stated that some of her siblings treat their father like a child.

**{¶32}** Julie declined to label Mr. Keane as suffering from dementia or Alzheimer's disease, because no doctor had told her that diagnosis. Later in her testimony, she conceded that Mr. Keane was prescribed a drug, the name of which she could not recall, which she described as "a very low dose for early signs of dementia."

{¶33} At oral argument, Appellants alleged that Josette prevented them from visiting their father. The record establishes three instances where Mr. Keane's children made plans to visit Mr. Keane but their plans were averted. In the first instance, Joan and her children scheduled lunch and a matinee with Mr. Keane, not Josette, in the fall of 2018. When they arrived at his home, Newsome was there but left shortly thereafter. As Mr. Keane was donning his coat, Josette called and spoke with him. When he hung up the phone, he told Joan that he could not go with them.

{¶34} According to Josette, Mr. Keane had a standing appointment to attend church at 3:00 p.m. with Scott, and she was reluctant to disturb his routine. Joan offered to take Mr. Keane to church, but Josette declined. Joan explained that it was the same church at the same time. Josette responded that Joan's failure to follow Josette's protocol was "bullshit" and typical of "this group of people." However, Josette concluded the text message with the suggestion that the siblings must "stay positive" and never say anything negative to Mr. Keane.

{¶35} In November of 2018, Vicki, a home care nurse with a certificate in gerontology, called Adult Protective Services ("APS") because she was concerned that Mr. Keane was not eating. Vicki conceded that she had not seen Mr. Keane for months, but explained that she thought it was important that her husband Jim have one-on-one time with his father.

{¶36} Vicki called APS based on comments allegedly made by Mr. Keane to neighbors that he would find himself outside and not remember how he got there, or that he wanted to go home when he was sitting in his living room. She expressed concern that Mr. Keane was not ambulating well, and, without, physical therapy, he was declining. Vicki testified that Josette and Mr. Keane are in denial about his diagnosis.

{¶37} As a consequence of her conversation with APS, Vicki filed her application for guardianship on November 30, 2018. In the guardianship application, Vicki lists the value of Mr. Keane's personal property at $165,000.00 and the value of his real property at $133,000.00.

{¶38} Vicki testified that Mr. Keane was very upset when he learned that a guardianship application had been filed. Mr. Keane interpreted Vicki's application as evidence that Vicki and Joyce were attempting to steal his money and land, and to "put

him away." Vicki conceded that Josette attempted to disabuse Mr. Keane of his misconceptions; Vicki testified that Josette "could have explained it better."

**{¶39}** In fact, Joyce had previously opened an annuity with the money from Mr. Keane's savings account, and designated herself as the primary beneficiary and Jane as the contingent beneficiary. At the hearing, Joyce explained that she would have divided the money evenly among her siblings in the event of Mr. Keane's death. According to Josette, whenever Mr. Keane asked Joyce about his money, Joyce would tell him not to worry and that he had plenty of money.

**{¶40}** Jane brought groceries for Mr. Keane and cleaned the kitchen and bathroom every other weekend prior to hospitalization. Joyce, who does not have a driver's license, would accompany Jane in order to write checks and balance Mr. Keane's checkbook. Jane testified that Mr. Keane needs 24-hour care, but that she had not offered any assistance after Mr. Keane terminated her as his healthcare power of attorney. According to Jane's testimony, Mr. Keane had accused her of taking his money and will not speak to her.

**{¶41}** Many of the children testified that Mr. Keane loaned money to them over the years for emergencies, with the caveat that the money must be repaid. However, on February 22, 2018, the same day that Mr. Keane was admitted to the hospital, there was a $5,100.00 withdrawal, which Jeanette used to make a past-due mortgage payment.

**{¶42}** In March of 2018, the same month that Mr. Keane returned home from Woodlawn, Mr. Keane visited his bank with Josette and designated Josette and Jerry as the beneficiaries of his $40,000.00 checking account. Three months later, in June of 2018, Mr. Keane made a loan of $8,000.00 to Josette to purchase Josette's new home. At the hearing, Josette conceded that she and her husband had not executed any paperwork documenting the loan, despite the fact that it was the largest sum Mr. Keane had ever loaned to one of his children.

**{¶43}** Physician's notes dated December 4, 2018, from NeuroCare Center documented a diagnosis of Alzheimer's disease with late onset. Namenda was prescribed for treatment of the disease. Mr. Keane was encouraged to stay socially active, exercise on a regular basis, and continue to maintain a regular sleep schedule and a structured environment. The notes read, in pertinent part, "Patient appears to be

thriving in his environment has [sic] family and friends who are assisting with medications finances and driving." A follow-up appointment was to be scheduled with a physician's assistant in six months.

{¶44} The next instance of Josette's alleged efforts to prevent Appellants from spending time with their father/father-in-law occurred in December of 2018. The Keane Family Christmas dinner, which had been held at a local restaurant for over a decade after Mrs. Keane became unable to prepare the holiday meal, was abruptly canceled via a letter signed by Mr. Keane and text circulated in mid-December. Josette testified that she was merely following Mr. Keane's orders, as he had informed her that he did not want to see his children.

{¶45} On January 17, 2019, Mr. Keane revoked Joyce's financial power of attorney and designated Josette in Joyce's stead. Joyce was notified by correspondence from Mr. Keane's attorney.

{¶46} According to a neuropsychological report dated January 30, 2019, which was prepared for the purpose of the guardianship proceedings, Dr. Martin concluded that "[Mr. Keane] retains adequate attention and every day reasoning skills to make simple, everyday like decisions such as where he lives, what he wears, [and] what his day-to-day schedule might be." Dr. Martin opines that "[Mr. Keane], his caregiver, and the family have demonstrated, [sic] ability to live a healthy, enjoyable life without a protective environment." However, Dr. Martin recommended that Mr. Keane requires assistance with memory sensitive tasks and supervision for bills and finances, medications, and complex legal and medical decisions, due to his inability to retain information.

{¶47} On February 27, 2019, when Mr. Keane was alone in his home, he fell while attempting to walk to a neighbor's home. He suffered contusions on his face. When Joan learned about his injuries, she and Jane went to his home, but Mr. Keane turned them away. He said they were no longer welcome and told them to "go away."

{¶48} Josette testified that the fall was a "big awakening moment" for Mr. Keane. He acknowledged that he "bit off more than he could chew." Mr. Keane conceded to Josette that roughly half of the way to his neighbor's house, he realized he had miscalculated the distance. Josette sat with Mr. Keane for three hours and concluded that he did not require medical attention.

{¶49} Jim, Joan, Joyce, and Jane filed their applications for guardianship on March 7, 2019. Jim conceded at the hearing that he traveled as a part of his job, so Vicki was the better choice between the two of them. Josette filed her application for guardianship on March 12, 2019. In the interim, on March 11, 2019, the probate court issued a judgment entry, which reads, in its entirety, "[t]he Court hereby suspends any and all financial powers of attorney pending the hearing on March 28, 2019."

{¶50} The final example of Josette's alleged interference occurred in March of 2019. Joan testified that she and the children cooked dinner for Mr. Keane on St. Patrick's Day for approximately thirty years. However, in 2019, Mr. Keane informed Joan that dinner was a bad idea as he did not know "what someone might think." Joan gave no credence to Mr. Keane's admonition, because she presumed that there would be no objection to the time-honored Keane family tradition.

{¶51} Joan and her children prepared the food on March 17, 2019, then texted Josette that they were on their way. Josette replied that she was only responding to save Mr. Keane "the freaking stress" because "the only concern [Mr. Keane] stressed to [Josette] was that [Joan and the children] might still show up after he told [Joan] not to." Josette informed Joan that Mr. Keane had already eaten, was taking a nap, and could not be disturbed. She further stated that Mr. Keane had plans and would be leaving shortly, then would go directly to bed when he returned home.

{¶52} Finally, Joan testified that Mr. Keane labored under the misconception that a judicial order prohibited his children from visiting him at his house. Joyce also testified that Mr. Keane believed that his children were required to meet him in town at a local restaurant if they wanted to see him.

{¶53} Joshua testified that Mr. Keane is angry at the children that refused to allow him to return to his home after being discharged from Woodlawn. Mr. Keane is also very angry about the annuity and the guardianship applications. Joshua testified that Mr. Keane had been confrontational at times, and, at other times, had refused to accept phone calls. Joan confirmed that Mr. Keane stopped accepting phone calls after the guardianship applications were filed. Joshua believes that Mr. Keane should not live alone, and that Vicki, with her training in elder care, is the best choice for guardianship.

**{¶54}** According to Josette's testimony, she filed her guardianship application at her father's request. She testified that her goal was to allow Mr. Keane to "liv[e] the last portion of his life as close as possible as he would like it to be." She conceded that she must walk the "fine line" when caring for her father between "safety and well-being." She further conceded that her contact with her siblings was limited, but explained that their exchanges were very negative, that they accused her of "being wrong" and not "know[ing] what [she] was talking about."

**{¶55}** Josette testified that she attempts to maintain a stress-free environment, because stress causes confusion for Mr. Keane. She further testified that Jerry, Julie, Jackie, Jeanette, and Jason were actively involved in their father's life, whereas Appellants do not participate. Josette reiterated that Mr. Keane was very angry about the guardianship proceedings and he believed that Joyce wanted to steal his money. Josette testified that Mr. Keane has good days and bad days.

**{¶56}** When asked to describe her efforts to repair the rift in her family, Josette replied that she has made some strides, but that Mr. Keane said that it would take some time. She added that Mr. Keane wants to "write people off right now"," and intimated that she dissuaded him from changing his will "a few times." She testified that he has "nothing to say" to her estranged siblings. However, as evidence of her willingness to reunite Jim and his father, she testified that she recently asked Mr. Keane if she could ask Jim to make accommodations to the exterior of Mr. Keane's residence.

**{¶57}** On May 5, 2019, after the hearing, Josette and her husband executed a promissory note and mortgage in favor of Mr. Keane. She attached copies of the note and mortgage to her post-hearing brief.

**{¶58}** In a judgment entry dated July 8, 2019, the probate court appointed Josette to be guardian of Mr. Keane's person and co-guardian of his estate. The probate court gave great weight to Josette's efforts to fulfill her father's desire to live in his own home until circumstances force him to be institutionalized. The probate court further noted that none of the other applicants had participated in Mr. Keane's care since he returned home from Woodlawn.

**{¶59}** The probate court predicated its "best interest" analysis on Rule of Superintendence 66.09, captioned "Responsibilities of guardian to ward." Rule 66.09(C)

requires a guardian to "make a choice or decision for a ward that best meets the needs of the ward while imposing the least limitations on the ward's rights, freedom, or ability to control the ward's environment." The rule further requires the guardian to "determine the least restrictive alternative." Rule 66.09(D), captioned "Person-Centered Planning," requires that "[a] guardian shall advocate for services focused on a ward's wishes and needs to reach the ward's full potential." The subsection continues, "[a] guardian shall strive to balance a ward's maximum independence and self-reliance with the ward's best interest." This timely appeal followed.

## ASSIGNMENT OF ERROR NO. 1

## THE PROBATE COURT ERRED IN SUSPENDING ALL POWERS OF ATTORNEY IN THE COURT'S MARCH 11, 2019 JUDGMENT ENTRY.

{¶60} Appellants contend that the March 11, 2019 judgment entry terminating any and all financial powers of attorney violates R.C. 2111.121(B). R.C. 2111.121, captioned "Nomination as guardian of person or estate; Procedure," reads, in pertinent part:

(A) A person may nominate in a writing, as described in this division, another person to be the guardian of the nominator's person, estate, or both * * * subject to notice and a hearing pursuant to section 2111.02 of the Revised Code. The nomination is for consideration by a court if proceedings for the appointment of a guardian of the person, the estate, or both, for the person making the nomination or if proceedings for the appointment of a guardian as the guardian of the person, the estate, or both * * * are commenced at a later time.

* * *

(B) A person's nomination, in a writing as described in division (A) of this section, of a guardian of the nominator's person, estate, or both * * * is revoked by the person's subsequent nomination, in a writing as described in division (A) of this section, of a guardian of the nominator's person, estate, or both * * * and, except for good cause shown or disqualification,

the court shall make its appointment in accordance with the person's most recent nomination.

**{¶61}** Appellants assert that the probate court should have appointed Joyce as guardian of Mr. Keane's estate based upon her previous nomination by Mr. Keane in the financial power of attorney executed on October 28, 2004. They advance the same argument with respect to the healthcare power of attorney nominating Jane as guardian in 2015. However, R.C. 2111.121(B) plainly states that a nomination is revoked by a subsequent nomination.

**{¶62}** Furthermore, in *In re Guardianship of Martin*, 7th Dist. Mahoning No. 09 MA 117, 2010-Ohio-3155, we recognized that the probate court is not bound by the nomination of guardianship provision in a power of attorney. *Id.* at ¶ 23. It is within the probate court's discretion to reject an applicant for guardianship even if she had been properly nominated in a power of attorney. *Id.,* citing *In re Guardianship of Hafner* (Nov. 24, 1993), 9th Dist. Summit No. 16073.

**{¶63}** Accordingly, we find that Appellants' first assignment of error, which alleges a violation of Ohio guardianship law, has no merit. As a consequence, we review the record in order to determine whether Josette's appointments constitute an abuse of discretion by the probate court.

## ASSIGNMENT OF ERROR NO. 2

**THE PROBATE COURT ERRED BY APPOINTING JOSETTE FOLK AS GUARDIAN OF THE PERSON OF THE ESTATE OF THE WARD, JAMES P. KEANE, IN THE COURT'S JULY 8, 2019 JUDGMENT ENTRY.**

## ASSIGNMENT OF ERROR NO. 3

**THE PROBATE COURT ERRED BY APPOINTING JOSETTE FOLK AS GUARDIAN OF THE ESTATE OF THE WARD, JAMES P. KEANE, IN THE COURT'S JULY 8, 2019 JUDGMENT ENTRY.**

**{¶64}** A guardian is deemed to be an officer of the probate court. *In re C.W.*, 7th Dist. Columbiana No. 13 CO 44, 2014-Ohio-2934, ¶ 19, citing *In re Clendenning*, 145

Ohio St. 82, 93, 60 N.E.2d 676 (1945). Ergo, the power of the probate court is superior to that of guardians appointed by the court. *Id.*; R.C. 2111.50(A)(1). With the exception of the disposition of gifts from a ward's estate, the power of the court relative to one declared a ward is to be exercised in his or her best interests. R.C. 2111.50(C)(1).

**{¶65}** A probate court's decision regarding matters involving guardianships will not be reversed on appeal unless the probate court's decision amounts to an abuse of discretion. *In re Estate of Bednarczuk*, 80 Ohio App.3d 548, 551, 609 N.E.2d 1310 (1992). It is well-settled that probate courts have broad discretion when appointing and removing guardians, and their decisions will not be reversed absent a showing of an abuse of that discretion. *Id.*, *In re Guardianship of Skrobut*, 7th Dist. Mahoning No. 97CA18 (Apr. 30, 1998).

**{¶66}** An abuse of discretion is more than an error of judgment, it implies that the trial court acted unreasonably, arbitrarily or unconscionably. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). When the record supports the probate court's appointment of a guardian, then no abuse of discretion can be shown. *In re Guardianship of Martin*, *supra*, ¶ 24.

**{¶67}** Appellants contend that the probate court engaged in a wholly inadequate analysis of Mr. Keane's best interest. To the contrary, the testimony offered at trial was polarized, and the resolution of guardianship turned completely on the believability of the testimony at the hearing. We have previously recognized that "[t]he credibility of the parties and other witnesses [is] a matter for the trier of fact as there may [be] 'much evidence in the parties' demeanor and attitude that does not translate to the record well.'" *Matter of T.M.M.*, 7th Dist. No. 17 CO 0025, 2017-Ohio-9219, 102 N.E.3d 558, ¶ 42, citing *Davis v. Flickinger*, 77 Ohio St.3d 415, 418–419, 674 N.E.2d 1159 (1997) (fact-finder had opportunity to view the witnesses and observe their demeanor, gestures and voice inflections and to use these observations in weighing credibility).

**{¶68}** Further, the probate court's rationale regarding the guardianship of Mr. Keane's person is supported by the record. Josette was the individual that made it possible for Mr. Keane to return to his own home after he was discharged from Woodlawn. Sup.R. 66.09(H) reads that "[a] guardian shall monitor and coordinate all services and benefits provided to a ward * * *." Josette, by organizing the efforts of his children, their

spouses, and Mr. Keane's grandchildren, and by employing Newsome, has been the architect of Mr. Keane's daily schedule since he returned home. She communicates with Mr. Keane several times per week.

**{¶69}** Sup.R. 66.09(E) states, in pertinent part, that "[a] guardian shall strive to foster and preserve positive relationships in the ward's life unless such relationships are substantially harmful to the ward." While Josette admitted that she made only the slightest effort to reconnect Mr. Keane with Appellants, they have likewise admitted that they made no effort to participate in his home care after he was discharged from Woodlawn.

**{¶70}** Although Appellants accuse Josette of intentionally isolating Mr. Keane, Josette's requirement that family members schedule their visits in advance is reasonable, based on Mr. Keane's need for routine, and the onset of stress when he feels upset or overwhelmed. To the extent that Mr. Keane is isolated, Appellants are equally responsible because they have made no effort to conform to the structure created by Josette in order to care for their father. Further, Appellants' alienation from their father/father-in-law appears to be the product of ignoring his wishes and, with respect to Joyce and Jane, engaging in self-serving financial gamesmanship.

**{¶71}** The fear for Mr. Keane's safety expressed by Appellants at the hearing was predicated upon comments from neighbors due to Appellants' lack of consistent contact with Mr. Keane. Appellants' fear for Mr. Keane's safely could be either substantiated or overcome if Appellants were actively involved in his care. Further, the probate court required that Mr. Keane be reevaluated every six months in order to determine that his environment is safe and comports with his best interest.

**{¶72}** Turning to Mr. Keane's estate, the probate court appointed co-guardian Joyce, in addition to Josette, to oversee Mr. Keane's finances. Although both daughters demonstrated self-dealing with respect to Mr. Keane's finances in the past, the probate court appointed co-guardians and placed financial conditions on the co-guardians designed to prevent any of his children from taking his money under the guise of a loan or otherwise in the future.

**{¶73}** In summary, we find that there is evidence in the record that supports the appointment of Josette as guardian of Mr. Keane's person and co-guardian of his estate. Josette was the applicant that fulfilled the requirements of Sup.R. 66.09, as reflected in

her efforts to balance Mr. Keane's desire to live at home with the necessity of keeping him safe and in good health. Further, the probate court appointed a co-guardian of the estate to prohibit any self-dealing. Therefore, we find that Appellants' second and third assignment of error have no merit.

## CONCLUSION

{¶74} Having reviewed the relevant law and the evidence in the record, we find that the probate court's appointments of Josette as guardian of Mr. Keane's person and co-guardian of his estate are neither contrary to law, nor do they demonstrate an abuse of discretion. Therefore, based on our limited review, we affirm the judgment entry of the probate court. However, our affirmance should not be interpreted as an endorsement of Josette's conduct in this case. Accordingly, the judgment entry of the probate court is affirmed.

Donofrio, J., concurs.

Robb, J., concurs.

Case No. 19 CA 0934

---

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas, Probate Division, of Carroll County, Ohio, is affirmed. Costs to be taxed against the Appellants.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**