[Cite as *In re Guardianship of Foust*, 2025-Ohio-5833.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: GUARDIANSHIP OF DIXIE L.
FOUST.

:

:

:

APPEAL NO. C-250148
TRIAL NO. 2024001815

*JUDGMENT ENTRY*

This cause was heard upon the appeal, the record, the briefs, and arguments.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 12/31/2025 per order of the court.**

**By:**_____
　　　　　**Administrative Judge**

[Cite as *In re Guardianship of Foust*, 2025-Ohio-5833.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


IN RE: GUARDIANSHIP OF DIXIE L. :
FOUST.

APPEAL NO.   C-250148
TRIAL NO.   2024001815

:

:        *O P I N I O N*


Appeal From: Hamilton County Court of Common Pleas, Probate Division

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: December 31, 2025


*Repper-Pagan Law, Ltd.,* and *Christopher Pagan*, for Appellant Kristian Guntzelman,

*Rick A. Jones*, for Appellee Randy Foust.

**MOORE, Judge.**

{¶1} Appellant Kristian Guntzelman appeals the judgment of the Hamilton County Court of Common Pleas, Probate Division denying his application to serve as the guardian of his step-mother Dixie L. Foust. For the reasons set forth below, the judgment of the probate court is affirmed.

## I.  Factual and Procedural History

{¶2} At the time this dispute arose, Dixie was a 71-year-old woman with dementia. Dixie lived at an assisted-living facility that provided specialized treatment for her condition.

{¶3} On April 24, 2024, Kristian Guntzelman, Dixie's stepson, applied to be the guardian of Dixie's "person" and "estate." On May 6, 2024, Randy Foust, Dixie's brother, also applied to be Dixie's guardian. Dixie executed both applications.

{¶4} The court held two hearings on the parties' competing guardianship applications. On July 29, 2024, the court heard testimony from the parties and their witnesses.

{¶5} Guntzelman testified on his own behalf. Guntzelman recalled that in 2020 he, Dixie, and Dixie's then agent pursuant to her power of attorney met to discuss changing who would serve as agent under her power of attorney, since the agent at the time lived out of state. Guntzelman explained that the parties and Dixie's attorney revised the power-of-attorney structure, so that Guntzelman was now a co-agent, along with Dixie's then agent. The power of attorney also stated that Guntzelman was Dixie's preferred guardian, should she need one. Under the beneficiary structure of Dixie's will, Guntzelman was the ultimate beneficiary of her trust upon Dixie's death.

{¶6} Guntzelman also called Dr. Lisa Gray, a board-certified geriatric psychiatrist, who had treated Dixie since 2020. Dr. Gray testified that Dixie's condition

from 2020 to 2024 had remained as a moderate case, but that her cognitive state had been in decline since 2020. Dr. Gray testified that in her expert opinion Dixie was competent when she executed the 2020 power-of-attorney form, but that she was not when she executed the competing guardianship applications in 2024.

{¶7} Randy believed that Dixie would be best served living with him instead of the assisted-living facility. Randy testified that he would provide better care for his sister and that she would have a better quality of life if she were to live with him. Randy explained that he knew what medicine she was on and that he would be able to drive her to her appointments. Randy admitted that he was not familiar with estate planning, but that he would be able to get any help he would need.

{¶8} The court also heard testimony from several witnesses, including friends and family of Dixie, and a common sentiment elicited was that Dixie did not like to speak with Guntzelman, and that the two did not speak often.

{¶9} On August 1, 2024, the magistrate's sua sponte order set another hearing date after he had been contacted by the Blue Ash Police Department with information relevant to the proceedings. On August 9, 2024, the court heard testimony from Detective Christopher Keuffer, who had initially contacted the magistrate. Keuffer explained that he became involved when he was contacted by the Hamilton County Sheriff's Department concerning an allegation that Dixie was experiencing elder abuse. While waiting to hear from the Elder Justice Unit in the Hamilton County Prosecutor's Office, Keuffer visited with Dixie. After visiting with Dixie, Keuffer's concerns as it related to the elder-abuse allegations were dispelled.

{¶10} However, soon thereafter, a liaison with the Elder Justice Unit put Keuffer into contact with Stephanie Fowl, an investigator from Fidelity Wealth Management. Keuffer recalled contacting Fowl, and explained that she informed him

of suspicious activity involving large purchases with funds from Dixie's estate. Keuffer recalled that Fowl explained that Fidelity had blocked Guntzelman from having direct access to trust funds, and that he had to provide receipts and receive Fidelity's approval before Fidelity would authorize payment from Dixie's account.

{¶11} Keuffer explained that he used "general, open source, investigative techniques" to get a better background on what some of these purchases might entail. Keuffer discovered three large questionable purchases using funds from Dixie's trust: a 2021 purchase of 45 vacant acres in Cascade, Colorado, for $525,000; a 2021 purchase of 35 vacant acres also in Cascade, Colorado, for $181,000; and a cash purchase of a Lucid Motors Grand Touring Air Edition, a luxury electric vehicle, for $154,000. Keuffer recalled contacting Guntzelman in June 2024 requesting all financial documents related to Dixie's trust but never heard back from Guntzelman. Keuffer concluded that the purchases were suspicious and failed to further Dixie's long-term care or well-being.

{¶12} At the conclusion of Keuffer's testimony, Guntzelman attempted to provide context for the purchases. Guntzelman explained that one of the properties was purchased using his own funds, that he and his wife held the property under a loan, completely independent from the trust. The other was purchased using Dixie's funds and Guntzelman explained that the land was an investment property, and that the intent was to subdivide and sell it off. Guntzelman explained that based on the time constraints of the deal, he used funds from Dixie's estate to purchase the property and that the property was in the process of being moved into the trust's name.

{¶13} As to the vehicle, Guntzelman explained that it was to compensate him and his wife for managing Dixie's trust. Guntzelman explained that he researched and determined $15,000 to $19,000 was an acceptable annual compensation range, that

5

he selected $15,000 as his annual compensation rate, and that he took an advance on future payments for managing the estate until 2025 to purchase the vehicle. Guntzelman stated that if the court did not deem him to be the appropriate person to serve as guardian, the court should appoint a third party as guardian.

{¶14} On August 20, 2024, the magistrate issued his decision denying Guntzelman's application. He took specific issue with Guntzelman's real estate purchases as a nonliquid asset that could not be readily transferred and faced the risk of sustaining a significant loss if the property needed to be liquidated. The magistrate opined that these sorts of investments could in theory provide long-term stability, but in practice would not provide flexibility to meet Dixie's emergent needs. Further, he questioned why title for the property purchased in 2021 was not returned to the trust at the time of the hearing.

{¶15} The magistrate similarly took issue with Guntzelman's purchase of the Lucid Motors electric vehicle using $154,000 of trust assets, and described the purchase as "messy and suspicious." Pursuant to Guntzelman's own compensation theory that an appropriate annual payment would range from $15,000 to $19,000, the fee compensation owed to him would range from $60,000 to $76,000, far below the $154,000 vehicle's purchase price. The magistrate emphasized that Guntzelman's compensation testimony "did not come close to equaling the value of the motor vehicle."

{¶16} The magistrate denied Guntzelman's application to serve as the guardian of Dixie's person and estate. The magistrate also denied Randy's application to manage Dixie's estate but granted his application to serve as the guardian for Dixie's person. The magistrate determined that the court would pick a third party to serve as the guardian of Dixie's estate.

6

**{¶17}** The probate court denied Guntzelman's objections to the magistrate's decision. The court noted that the magistrate had good cause to deny Guntzelman's application to serve as guardian and affirmed the magistrate's decision in part. The court, however, modified the magistrate's decision in part, finding a separate third party acting as the guardian of Dixie's person would further Dixie's best interests.

**{¶18}** This appeal followed.

## II. Analysis

**{¶19}** Guntzelman argues, in a sole assignment of error, that the probate court erred in rejecting his application to serve as Dixie's guardian.

### A. The probate court did not err in rejecting Guntzelman as Dixie's nominated guardian

*1. The trial court's appointment did not violate R.C. 2112.121(B) and 2111.02(D)(2)*

**{¶20}** A probate court's appointment of a guardian is reviewed for an abuse of discretion. *In re T.E.*, 2024-Ohio-3410, ¶ 14 (1st Dist.). R.C. 2111.50(A)(1) provides that the probate court serves as the "superior guardian," and that the probate court is tasked with supervising a guardian to ensure the guardian acts in the best interest of the ward. The probate court must act in ward's best interest when appointing the ward's guardian. *In re Guardianship of Waller*, 2011-Ohio-311, ¶ 16 (1st Dist.). Abuse of discretion connotes that the court's decision was "unreasonable, arbitrary, or unconscionable." *Id.*, quoting *Garry v. Borger*, 2023-Ohio-905, ¶ 14 (1st Dist.), citing *Berk v. Matthews*, 53 Ohio St.3d 161, 169 (1990). We will not reverse a judgment appointing a guardian if that decision is supported by competent and credible evidence. *Waller* at ¶ 16. However, where a court commits a legal error, we review those issues de novo. *Rover Pipeline, L.L.C. v. Harris*, 2025-Ohio-2806, ¶ 27.

**{¶21}** There are two relevant statutes, R.C. 2111.02(D)(2) (the "Appointment

7

Statute") and R.C. 2111.121(B) (the "Nomination Statute"). The Appointment Statute provides that an incompetent adult shall have preference in the appointment of his or her guardian if that appointee is "competent, suitable, and willing to accept the appointment." The Nomination Statute provides that a person's written nomination of a guardian may be revoked by a subsequent written nomination. This statute also states that "except for good cause shown or disqualification, the [probate] court shall make its appointment in accordance with the person's most recent nomination [in a writing as described in division (A)]."

{¶22} The Nomination Statute's good-cause language, which was adopted in 2013, broadened the court's discretion. The pre-amendment version of the statute required courts to appoint the guardian identified in the written nomination if the person nominated was "competent, suitable, and willing to accept" the position. However, under the current version of the statute, a court needs only to have "good cause" to deviate from the ward's most recent nominee, and to appoint a prior nominee.

{¶23} While a person may nominate an individual to serve as her guardian, the court is not bound by this nomination, and the holding in *In re Myers*, 2017-Ohio-603, ¶ 42 (5th Dist.), demonstrates this. There, a ward nominated her spouse to serve as her guardian through her power of attorney. *Id.* at ¶ 4. However, after surviving cancer, she was left with a condition that compromised her memory and she required constant supervision. *Id.* at ¶ 6. Her spouse transferred the ward's business and real estate interests to himself without payment or receiving the ward's approval, left the ward living with her daughter, moved to Florida to begin living with his girlfriend, infrequently visited the ward, had not assisted in her at-home care, and sold the parties' marital home against the caretaker of the ward's wishes. *Id.* at ¶ 7-12.

**{¶24}** The Fifth District recognized that while the spouse was the nominated guardian, the probate court was not bound to this nomination and was within its discretion to reject a guardian properly nominated through a ward's power of attorney. *Id.* at ¶ 42; *see In re Guardianship of Keane*, 2020-Ohio-1105, ¶ 62 (7th Dist.) (similarly holding the probate court is not bound to a preferred-appointment provision in a power of attorney); *Schneider v. Kelley*, 2004-Ohio-1378, ¶ 17-20 (7th Dist.) (holding the court did not err in denying the ward's agent under a power of attorney from serving as a guardian because of "questionable practices" in managing the ward's assets). While the court recognized that the spouse ensured that the ward was in a nursing home that could meet her needs, the court considered the totality of the circumstances when it assessed whether the spouse would serve as a suitable guardian. *Myers* at ¶ 50-56.

**{¶25}** Here, like in *Myers*, the probate court did not err in rejecting Guntzelman's guardianship application. The magistrate considered ample evidence of large purchases using Dixie's trust funds that he characterized as suspicious and possibly self-dealing in nature and which ultimately failed to further Dixie's best interests. While Guntzelman suggests that the probate court's conclusion that the magistrate had "good cause" to deny the application is indicative of an incomplete review of the record, this fails to account for the fact that the probate court disagreed with the magistrate and ultimately modified the magistrate's decision. Thus, Guntzelman has failed to persuasively identify how this indicates that the court did not engage in an independent review of the record.

**{¶26}** At oral argument, Guntzelman asked that this court harmonize alleged discrepancies between the Appointment Statute's "competent" and Nomination Statute's "good cause" requirements to deny a guardian appointment, however we

9

need not do so. The Nomination Statute's "good cause" language only comes into play where a ward has nominated different guardians over time, and the court is considering whether the court has "good cause" to deviate from the ward's most recent nominee and to select a prior nominated guardian. Because the court below was not deviating to a prior nominee and considered an independent third party, the Nomination Statute is inapplicable here and we only need to apply the Appointment Statute, and assess whether the court erred in denying Dixie's preferred appointee.

{¶27} The court heard that Guntzelman engaged in self-dealing and suspicious behavior and used trust assets to compensate himself in advance for work yet to be done. While the court heard testimony from one of Dixie's doctors that Dixie's condition has progressively gotten worse and that remaining in the care facility will meet her medical needs, whether a guardian is suitable to furthering the best interests of the ward requires a court to consider the totality of the circumstances. *See in re Baker*, 2024-Ohio-2350, ¶ 37 (4th Dist.), quoting *In re Briggs*, 1997 Ohio App. LEXIS 3050, *3 (9th Dist. Jul. 9, 1997) ("'Best interests' means the permanent welfare of the ward in his relation to society in view of all the circumstances."). Here, the probate court had the chance to review the magistrate's findings and weigh all of Guntzelman's conduct, and concluded that Guntzelman was not suitable to serve as Dixie's guardian. From a complete review of the record, we cannot say that the court abused its discretion in denying Guntzelman's application.

2. *The trial court's appointment of separate guardians*

{¶28} Guntzelman argues that the court erred when it appointed two separate guardians, and that this decision was in violation of R.C. 2111.06. However, Guntzelman lacks standing to raise this issue.

{¶29} "To have standing in an appeal from a guardianship order, parties must

either have an interest adverse to the ward's or have otherwise been aggrieved in some manner by the order." *In re Guardianship of Santrucek*, 2008-Ohio-4915, ¶ 5, citing *In re Guardianship of Love*, 19 Ohio St.2d 111, 115-116 (1969). "A party who is not aggrieved or prejudiced by a judgment does not have standing to appeal." *Travelers Property Cas. Corp. v. Chiquita Brands Internatl., Inc.*, 2024-Ohio-1775, ¶ 46-47 (1st Dist.). To be an "aggrieved party" with standing to appeal, a party must show they have an interest in the matter and that they were prejudiced by the lower court's judgment. *Id.* at ¶ 47, citing *Willoughby Hills v. C.C. Bar's Sahara*, 64 Ohio St.3d 24, 26 (1992), citing *Ohio Contract Carriers Assn., Inc. v. Pub. Util. Comm.*, 140 Ohio St. 160, 161 (1942).

{¶30} While Guntzelman has standing to challenge the court's denial of his guardianship application, he lacks standing to challenge the court's appointment of separate guardians. We therefore do not consider this argument.

### III. Conclusion

{¶31} We therefore overrule Guntzelman's sole assignment of error, and to the extent that he lacks standing to challenge the appointment of separate guardians, we do not address this argument. The judgment of the probate court is affirmed.

Judgment affirmed.

**KINSLEY, P.J.,** and **NESTOR, J.,** concur.