[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Rover Pipeline, L.L.C. v. Harris*, Slip Opinion No. 2025-Ohio-2806.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2025-OHIO-2806

ROVER PIPELINE, L.L.C., APPELLANT, *v*. HARRIS, TAX COMMR., APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Rover Pipeline, L.L.C. v. Harris*, Slip Opinion No. 2025-Ohio-2806.]

*Taxation—Public-utility property—R.C. Ch. 5727—Board of Tax Appeals has wide discretion in determining weight to be given to evidence and credibility of witnesses when faced with "battle of appraisals"—Board's adoption of tax commissioner's appraisal evidence was reasonable and lawful—Board's decision affirmed.*

(No. 2024-0484—Submitted June 4, 2025—Decided August 13, 2025.)

APPEAL from the Board of Tax Appeals, No. 2020-1540.

_____

FISCHER, J., authored the opinion of the court, which KENNEDY, C.J., and DEWINE, BRUNNER, DETERS, HAWKINS, and SHANAHAN, JJ., joined.

**FISCHER, J.**

{¶ 1} Under Ohio law, the taxable property of a public utility shall be assessed at its true value in money. *See* R.C. 5727.10. At issue in this appeal is the true value for tax year 2019 of an interstate natural-gas pipeline owned and operated by appellant, Rover Pipeline, L.L.C. The Board of Tax Appeals ("board" or "BTA") rejected the report proposed by Rover's appraiser, finding that the value proposed by appellee Tax Commissioner Patricia Harris's appraiser reflected the best evidence of the pipeline's value. Rover appealed the board's decision to this court. Rover's challenge is multifaceted, but the crux of its argument is that the board vastly overvalued the pipeline. Because Rover has not shown that the board committed reversible error, we affirm.

## I. BACKGROUND

{¶ 2} The record in this case is voluminous and is amply described in the board's decision. *See* BTA No. 2020-1540 (Mar. 7, 2024). We recount only those facts that are necessary to put the case in its proper context and to frame the legal issues presented by the parties.

### *A. Planning and building the pipeline*

{¶ 3} Rover's pipeline is over 700 miles long and transports natural gas from the Marcellus and Utica shale basins located in Ohio, West Virginia, and Pennsylvania to markets across the United States and Canada. The Ohio portion of the pipeline runs from the east–central area of the State to a location in Defiance County, where it turns north and heads into Michigan. The pipeline has the capacity to transport 3.25 billion cubic feet of natural gas per day.

{¶ 4} Beginning in 2013 and 2014, Rover determined that it could profit from the installation of a pipeline in the basins, which could ease a bottleneck that had emerged from insufficient infrastructure. Before commencing the pipeline's construction and operation, however, Rover first had to apply for and receive approval from the Federal Energy Regulatory Commission ("FERC"). *See*

*Alabama Mun. Distribs. Group v. Fed. Energy Regulatory Comm.*, 100 F.4th 207, 209 (D.C. Cir. 2024), citing 15 U.S.C. 717f(c)(1)(A). In determining whether to approve such an application, FERC will often check whether an applicant has collected precedent agreements—"long-term contracts with shippers who would use the pipeline to transport natural gas"—which demonstrate demand for the project. *Oberlin v. Fed. Energy Regulatory Comm.*, 39 F.4th 719, 722 (D.C. Cir. 2022).

{¶ 5} To facilitate FERC's approval, Rover negotiated several precedent agreements with shippers in the region. The agreements accounted for 95 percent of the pipeline's capacity. As a representative example, one agreement authorized a shipper to transport specified quantities of natural gas through Rover's pipeline at a fixed price for 15 years, with an option to extend.

{¶ 6} Rover's negotiations with the shippers were informed by its understanding of the project's construction costs and the return Rover could earn on its investment. Rover initially estimated that it would cost $4.2 billion to construct the pipeline. Based on that estimate, it structured its precedent agreements to achieve a 13 percent return on equity.

{¶ 7} FERC approved Rover's application in February 2017, but the project's actual cost—$6.3 billion—vastly exceeded Rover's expectations. Two factors contributed to this increase.

{¶ 8} First, abnormally high levels of rainfall caused construction delays and increased costs. During periods of inactivity because of heavy rainfall, idle workers continued to be paid per the terms of their employment agreements. The same goes for leased equipment, which sat onsite while the conditions were too wet for construction. While the project area historically received 37.38 inches of rain annually, during construction, the area received 61.08 inches of rain, annualized.

{¶ 9} Second, in April 2017, Rover ran into an environmental problem when one of its contractors released two million gallons of bentonite-based drilling

fluid while drilling underneath the Tuscarawas River. The drilling fluid surfaced in a wetland near the river, covering approximately 6.5 acres. Rover notified FERC of the incident, and, in response, FERC ordered Rover to, among other things, stop drilling activities in certain locations and double the number of environmental inspectors per work area. Construction on the pipeline stalled for four to five months because of regulatory actions taken by FERC and Ohio's Environmental Protection Agency.

{¶ 10} In November 2018, the pipeline was completed and became available for commercial operation.

### B. The Blackstone transaction

{¶ 11} In July 2017, the investment firm Blackstone acquired a 49.9 percent equity stake in ET Rover Pipeline, L.L.C., Rover's "corporate great-grandparent," BTA No. 2020-1540 at 7 (Mar. 7, 2024), eventually paying $1.51 billion for its ownership interest.[1] Because ET Rover Pipeline owned a 65 percent interest in Rover, Blackstone thus acquired a 32.435 percent indirect ownership interest in Rover.

{¶ 12} ET Rover Pipeline thus retained a controlling interest by the slimmest of margins under the terms of the deal—50.1 percent to Blackstone's 49.9 percent. Nevertheless, Blackstone gained access to 32.435 percent of the cash flows generated by Rover's pipeline.

### C. Proceedings before the tax commissioner

{¶ 13} Ohio's public-utility-property tax is set forth in R.C. Ch. 5727. It is undisputed that Rover is subject to the tax as a "pipe-line company." *See* R.C. 5727.01(D)(5) (defining "pipe-line company" as a taxpayer "engaged in the

---

1. The actual purchaser was BCP Renaissance, L.L.C., which is held by Blackstone. For purposes of this appeal, the parties have characterized Blackstone as the purchaser; accordingly, we do the same. Blackstone paid for its interest in installments, with the bulk of the payments made during the fourth quarter of 2017.

business of transporting natural gas, oil, or coal or its derivatives through pipes or tubing, either wholly or partially within this state"). As a pipeline company, Rover's taxable property subject to assessment by the tax commissioner for the 2019 tax year consisted of its tangible personal property located in Ohio on December 31 of the preceding year—here, December 31, 2018 (i.e., the tax-lien date)—but not including property otherwise exempted by law. *See* R.C. 5727.06(A)(3)(c); *see also* R.C. 5727.06(C) (providing that the lien attaches on December 31 of the year preceding the tax year at issue). The taxable property of a pipeline is assessed at 88 percent of its true value. R.C. 5727.111(D).

{¶ 14} To facilitate administration of the tax, Rover filed an annual report (later amended) with the tax commissioner on a prescribed form, enabling the tax commissioner to make any assessment or apportionment the tax required. *See* R.C. 5727.08. Afterward, the tax commissioner issued Rover an amended assessment certificate. *See* R.C. 5727.23. In turn, Rover filed a petition for reassessment. *See* R.C. 5727.47.

{¶ 15} The tax commissioner's review culminated in a final determination affirming the assessment, which, according to Rover, assigned a value of $3.983 billion to the Ohio portion of the pipeline. In doing so, the tax commissioner applied R.C. 5727.11(A), which provides that "the true value of all taxable property . . . required by section 5727.06 of the Revised Code to be assessed by the tax commissioner shall be determined by a method of valuation using cost as capitalized on the public utility's books and records less composite annual allowances as prescribed by the commissioner." By law, the tax commissioner may use another method if she finds that application of the statutory method "will not result in the determination of true value of the public utility's taxable property." *Id.*; *accord Texas E. Trans. Corp. v. Tracy*, 1997-Ohio-233, ¶ 17.

{¶ 16} Although Rover proposed alternative valuation methods, the tax commissioner determined that the alternative methods did not show a defect in the

statutory method; rather, the alternative methods were, in her view, no more than opinions of alternative values. Nor was the tax commissioner persuaded by Rover's attempt to decrease the value of its pipeline based on delays attributable to weather or regulatory actions. The tax commissioner reasoned that rainy weather was to be expected and that weather delays should have been budgeted for. She further reasoned that the regulatory actions were related to Rover's regulatory violations and that the resulting costs were within Rover's control. Rover appealed to the board.

### D. Proceedings before the board

{¶ 17} Rover and the tax commissioner both presented appraisal evidence at the board's hearing. Rover presented an appraisal report prepared by Robert Reilly, who prepared a unit appraisal. Unlike the cost-based method preferred under R.C. 5727.11(A), in a unit appraisal, the "professional appraiser determines the 'unit' to be appraised (such as the public utility's operating properties), estimates the market value of that unit, and allocates an appropriate portion of the unit to the taxing jurisdiction." *Ohio Bell Tel. Co. v. Levin*, 2009-Ohio-6189, ¶ 9; *see also Texas E. Trans.* at ¶ 15 (distinguishing between the statutory method and the unit-appraisal method). Reilly prepared a unit appraisal because, as he indicated in his appraisal report, he viewed the pipeline as "operat[ing] as a single physically, functionally, and economically integrated unit of property." Reilly characterized the pipeline as a special-purpose property, which this court has described as a property being "built for a unique purpose . . . in good condition, and . . . used for that purpose—both presently and for the foreseeable future," *Johnston Coca Cola Bottling Co., Inc. v. Hamilton Cty. Bd. of Revision*, 2017-Ohio-870, ¶ 17.

{¶ 18} Reilly, using both the cost and income approaches to value, opined two values under each approach. For the cost approach, Reilly opined values of $3.206 billion and $3.227 billion; for the income approach, Reilly opined values of $3.591 billion and $3.851 billion. Reilly did not use the sales-comparison approach

due to the lack of data reflecting prior sales of property comparable to the pipeline. Reilly weighted the cost approach more heavily than the income approach, opining a reconciled value of $3.317 billion for the pipeline as a whole as of December 31, 2018. Reilly reduced that value to $2.562 billion by applying the Ohio-allocation percentage of 77.252 percent, which he then further reduced to $1.792 billion by excluding the cost of exempt property.

{¶ 19} For her part, the tax commissioner jettisoned the appraisal method she had used in her final determination, which relied on the statutory method in R.C. 5727.11(A), and presented an appraisal report prepared by Brent Eyre. Like Reilly, Eyre valued the pipeline as a unit, characterized it as a special-purpose property, and relied on the cost and income approaches to value. But Eyre opined a value of $6.226 billion under the cost approach and $5.119 billion under the income approach, and he weighted each approach equally, opining a reconciled value of $5.670 billion for the pipeline as a whole as of December 31, 2018. Eyre reduced that value to $4.380 billion by applying the Ohio-allocation percentage of 77.252 percent, which he then further reduced to $3.669 billion by excluding the cost of exempt property.

{¶ 20} The tax commissioner also presented a report prepared by Bradford Cornell, who addressed the effect of the Blackstone transaction on the pipeline's value. In Cornell's view, the Blackstone transaction implied that the true value of the pipeline as a whole was at least $4.66 billion, which he calculated by dividing Blackstone's contribution of $1.510 billion by its 32.435 percent indirect interest in Rover. This value, Cornell testified, provided "the floor of the value for the entire entity." Cornell further observed that based on the calculations he had reviewed, the implied value could be extended "north[ward]" to "probably around $5 billion."

{¶ 21} The board issued a lengthy decision determining that Eyre's appraisal constituted the best evidence of value, and it thus reversed the tax

commissioner's final determination and remanded the matter with instructions that Rover's pipeline be valued according to Eyre's appraisal. BTA No. 2020-1540 at 164 (Mar. 7, 2024). In doing so, the board assigned special significance to the Blackstone transaction and the actual costs of construction, clarifying that while these data points were not "conclusive," they nevertheless established "guideposts" for its decision. *Id.* at 109.

{¶ 22} Regarding the Blackstone transaction, the board found what it called a "straight line" between Blackstone's purchase of its interest in ET Rover Pipeline and the pipeline itself. *Id.* at 112. The board credited the testimony of Cornell, who testified that Blackstone's purchase was a means of gaining access to cash flows from the pipeline. Based on Cornell's testimony, the board found it "clear" that "[t]he value purchased by Blackstone was tied to the hard assets" of the pipeline. *Id.* at 114. It was thus proper, the board reasoned, to view the transaction as probative in determining the pipeline's value. *Id.* at 123.

{¶ 23} Turning to costs, the board determined that it was appropriate to account for actual costs in determining the pipeline's value because it was special-purpose in character and newly constructed as of the tax-lien date. *Id.* at 124-125. In support of this determination, the board cited, among other things, this court's observation that the cost approach is helpful in estimating the value of new or relatively new construction, *see Musto v. Lorain Cty. Bd. of Revision*, 2016-Ohio-8058, ¶ 47, and a passage from *The Appraisal of Real Estate* 530 (15th Ed. 2020), explaining that the cost approach may be used to value special-purpose properties that are infrequently exchanged on the market.

{¶ 24} The board was highly critical of Reilly's appraisal. First, the board determined that Reilly had sacrificed his independent judgment by allowing Rover to dictate key figures to him, thereby converting "what began as an independent fee appraisal . . . into a group project." BTA No. 2020-1540 at 2 (Mar. 7, 2024). Second, the board found that Reilly had conflated aspects of the cost approach with

the income approach, thus "mak[ing] his income approach a load-bearing pillar of the cost approach." *Id.* at 3. And last, the board found that Reilly's opinion of value could not be reconciled with the Blackstone transaction or the pipeline's actual costs. *Id.* at 126. As to the former, the board reasoned that if Reilly's reconciled value of $3.317 billion were correct, that would mean that Blackstone substantially overpaid for its interest, which the board found implausible due to Blackstone's dealmaking sophistication. *Id.* As to the latter, Reilly's reconciled value was almost 50 percent below the pipeline's actual costs, prompting the board to question how "a pipeline in its infancy became so obsolete so fast." *Id.* at 2.

{¶ 25} Turning to Eyre's appraisal report, the board found it reasonable that his reconciled value fell between the imputed value of the Blackstone transaction and the project's actual costs. *Id.* at 164. The board did fault Eyre for not analyzing the Blackstone transaction in his written appraisal report, but as a whole, it found that Eyre's appraisal reflected the best evidence of value, and it ordered that the pipeline be valued according to his opined value. *Id.*

{¶ 26} Rover then appealed to this court.

## II. ANALYSIS

{¶ 27} We must affirm a BTA decision that is reasonable and lawful. R.C. 5717.04; *Adams v. Harris*, 2024-Ohio-4640, ¶ 23. Our standard of review is well established: legal issues are subject to de novo review, *Dauch v. Erie Cty. Bd. of Revision*, 2017-Ohio-1412, ¶ 12, but issues relating to the credibility of witnesses and the weighing of the evidence are subject to abuse-of-discretion review, *Johnson v. Clark Cty. Bd. of Revision*, 2018-Ohio-4390, ¶ 9.

{¶ 28} This case featured a "battle of appraisals," *Target Corp. v. Greene Cty. Bd. of Revision*, 2009-Ohio-2492, ¶ 14, which is a shorthand phrase to describe the class of cases in which the board is called on to review competing appraisal evidence. "When it reviews appraisals, the BTA is vested with wide discretion in determining the weight to be given to the evidence and the credibility of the

witnesses that come before it." *EOP-BP Tower, L.L.C. v. Cuyahoga Cty. Bd. of Revision*, 2005-Ohio-3096, ¶ 9. To this end, we have "decline[d] to bind the BTA to a particular method of valuation because the imposition of rigid methodological strictures would necessarily impinge upon the BTA's wide discretion to weigh evidence and assess the credibility of witnesses." *Youngstown Sheet & Tube Co. v. Mahoning Cty. Bd. of Revision*, 66 Ohio St.2d 398, 402 (1981). Because this court is not a "super BTA or a trier of fact de novo," *EOP-BP Tower* at ¶ 17, it matters not "whether we might have weighed the evidence differently from the [board] if we had been making the original determination," *Jewel Cos., Inc. v. Porterfield*, 21 Ohio St.2d 97, 99 (1970). Unless it "affirmatively appears from the record" that the board's value determination is unreasonable or unlawful, we "will not disturb [it]." *Cuyahoga Cty. Bd. of Revision v. Fodor*, 15 Ohio St.2d 52 (1968), syllabus.

{¶ 29} An overarching theme of Rover's argument is that the board's decision is suffused with what it calls "legal error." Yet, this case does not, for example, call on us to determine the meaning of a statute. *See, e.g.*, *Progressive Plastics, Inc. v. Testa*, 2012-Ohio-4759, ¶ 15 ("A dispute over the meaning of statutes presents a question of law, and our review in that regard is not deferential but de novo."). As Rover's brief makes clear, the statutory meaning of "true value" as written into Ohio's tax laws is well understood: it is the "'amount for which that property would sell on the open market by a willing seller to a willing buyer,' " *Boothe Fin. Corp. v. Lindley*, 6 Ohio St.3d 247, 248 (1983), quoting *State ex rel. Park Investment Co. v. Bd. of Tax Appeals*, 175 Ohio St. 410, 412 (1964); *see also Grabler Mfg. Co. v. Kosydar*, 43 Ohio St.2d 75, 77 (1975) (extending *Park Investment Co.* to personal-property cases). To paraphrase, true value is "market value." *Boothe Fin. Corp.* at 248. And, as noted above, the determination of true (or market) value presents a question of fact. *Texas E. Transm.*, 1997-Ohio-233, at ¶ 19.

{¶ 30} To be sure, some of Rover's arguments implicate the proper boundaries of valuation doctrine, which is used to implement the true-value standard. And we agree that the proper scope of these valuation doctrines present legal questions. But this case turns primarily on how the board weighed the competing appraisal evidence in determining the pipeline's true value, which triggers a "highly deferential" abuse-of-discretion standard of review, *Arbors E. RE, L.L.C. v. Franklin Cty. Bd. of Revision*, 2018-Ohio-1611, ¶ 13.

{¶ 31} With these background principles in mind, we now turn to Rover's four propositions of law.

*A. Whether the board valued Rover as a business rather than the pipeline itself*
*(Rover's Proposition of Law No. 1)*

{¶ 32} In its first proposition of law, which Rover divides into two subparts, Rover claims that the board erred by adopting Eyre's valuation, which Rover contends reflected its value as a business rather than the true value of its pipeline. We disagree.

### *1. Terminology*

{¶ 33} The first subpart of Rover's argument focuses on the terms of art that Eyre used in describing his appraisal method. In Rover's view, Eyre's treatment of the pipeline as a "going concern" led him to value Rover as a business.

{¶ 34} In the real-property-valuation context, we have articulated what may be termed an "isolation principle," stating that "an appraiser must exercise care to isolate the value of the realty from the value of the business." *HCP EMOH, L.L.C. v. Washington Cty. Bd. of Revision*, 2018-Ohio-4750, ¶ 14; *see also Arbors E. RE*, 2018-Ohio-1611, at ¶ 19 (collecting cases and discussing the isolation principle). There can be little doubt that an appraiser of a pipeline must apply a similar isolation principle given that the public-utility-property tax applies to the "true value in money" of the public utility's "taxable property," R.C. 5727.10, not the value of its business. *Id.; see also Texas E. Trans.*, 1997-Ohio-233, at ¶ 17 ("the

ultimate goal imposed by R.C. 5727.10 clearly is to determine the *true value* of the property taxed" [emphasis in original]).

{¶ 35} Rover claims that Eyre veered from this principle by characterizing the objective of his appraisal as obtaining the valuation of the pipeline as a "going concern." By doing so, Rover maintains, Eyre swept in value unrelated to the pipeline itself. To illustrate, Rover points to Eyre's appraisal report, in which he included the following quote from *The Appraisal of Real Estate* 23-24 (10th Ed. 1992): Going-concern value "includes an intangible enhancement of the value of an operating business enterprise which is produced by the assemblage of the land, building, labor, equipment, and marketing operation." Rover faults Eyre's statement in which he said that "[b]y operating together as a unit, the operating assets achieve their highest and best use."

{¶ 36} Rover fails to specify what Eyre's terminology translates to in terms of tax dollars owed under R.C. Ch. 5727. Moreover, we reviewed Eyre's appraisal and cannot locate any line-item denomination for "intangible enhancement" that sweeps in the value of such things as labor, marketing, or general business acumen. Indeed, in asking us to remand the case to the board so that it may explore the issue further, Rover effectively admits that its argument is short on numerical details. There is no need to order such relief—Rover had ample opportunity to explore the issue during the board's multi-day evidentiary hearing.

{¶ 37} The first subpart of Rover's argument in support of its first proposition of law contains additional problems. Eyre's use of the term "going concern" might at first glance appear troublesome because, given the term's ordinary understanding, its use here suggests that Eyre valued Rover based on the value of "the enterprise itself as an active business with future earning power, as opposed to the liquidation value of the business or of its assets," *Black's Law Dictionary* (12th Ed. 2024) (defining "going-concern value"). But Eyre disavowed in his appraisal report that he did this, clarifying that as he uses the term, "'[g]oing

concern' . . . is not synonymous with enterprise value." Eyre was careful to note as well that his use of the term "intangible enhancement" did not signify that he had swept the value of intangible assets into his appraisal.

{¶ 38} The board understood Eyre's method as he described it, and we need not second-guess it. *See Olmsted Falls Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision*, 2009-Ohio-2461, ¶ 27 ("we will not second-guess the precise weight that the BTA accords to each increment of evidence when it determines the value of real property"). Although the board recognized that Eyre's method bore a similarity to the method of valuing a business, it rejected the idea that he had valued Rover as a business. Rather, in the board's view, inclusion of an intangible enhancement simply "reflects the benefit created by the unitary operation of the tangible personal property that is not attributable to cost or other intangible assets." BTA No. 2020-1540 at 157 (Mar. 7, 2024). That finding is borne out by Eyre's statement that the pipeline derives its value from the interaction of its component parts, not from the component parts on an item-by-item basis: "A mile of pipe in the ground has value, not because you can sell it for scrap, but because it is connected to an integrated pipeline system." Eyre is hardly alone here, for Reilly performed a unit appraisal as well, observing in his appraisal report that this method was proper because it accounted for the "pipeline's operat[ion] as a single, physically, functionally, and economically integrated unit of property."

### 2. The pipeline's useful life

{¶ 39} The second subpart of Rover's argument in support of its first proposition of law contends that Eyre rendered a business valuation by assuming for the purpose of his income approach that the pipeline would exist in perpetuity—an assumption, it says, that is more suitable to valuing a business than valuing a piece of property. A better assumption, according to Rover, is that the pipeline should be expected to have a useful life of 30 years. Rover levels similar arguments against Eyre's assumptions related to deterioration and capital expenditures, saying

that those assumptions fail to realistically account for wear and tear over time. In all, Rover claims that Eyre's mistakes led him to overvalue the pipeline by about $1.7 billion.

{¶ 40} The issues that Rover points to relate to Eyre's application of the discounted-cash-flow analysis. The model is technical, but at a high level, it reflects Eyre's attempt to value the pipeline by calculating the pipeline's future cash flows and then discounting them back to the tax-lien date. To simplify, Eyre calculated cash flows for 2019 through 2021, which he drew from Rover's planning documents. But because the pipeline was not expected to lie dormant after 2021, he determined that he needed a way to account for cash flows that extended beyond 2021. To do this, Eyre calculated what he described as a "terminal value," which reflects a value computation that assumes the realization of cash flows in perpetuity. Eyre testified that his terminal-value calculation assumes that future cash flows would keep up with inflation, capital expenditures would remain the same as they were across the average of 2019 through 2021, and depreciation would increase slightly. Having computed a terminal value, Eyre then discounted the explicit cash flow forecasts and the terminal value back to present value on the assessment date of December 31, 2018, which he then added to the present value of the cash flows from 2019 through 2021 to achieve a total discounted-cash-flow value. The board found Eyre's approach reasonable and his calculation persuasive. BTA No. 2020-1540 at 162 (Mar. 7, 2024).

{¶ 41} By urging this court to rule out the possibility that an appraiser could ever do such a thing as, say, value cash flows in perpetuity, Rover thus seeks to have us announce a rule of law that would bind the board to a particular method of valuation. We have long declined to take this step. *See Youngstown Sheet & Tube*, 66 Ohio St.2d at 402 ("We decline to bind the BTA to a particular method of valuation because the imposition of rigid methodological strictures would

necessarily impinge upon the BTA's wide discretion to weigh evidence and assess the credibility of witnesses.").

{¶ 42} Rover rejoins by attempting to distinguish the concepts of business value and property value, pointing to *Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 564-565 (1993), for the proposition that a *business's* goodwill lacks a determinate useful life. But that observation scarcely prescribes a binding rule for this court to apply that would require us to invalidate the board's adoption of Eyre's approach. Just as this court is not composed of "accountants []or engineers," *Dayton v. Pub. Util. Comm.*, 174 Ohio St. 160, 162 (1962), neither are we composed of appraisers whose function is to announce rules that the legislature did not prescribe for determining the useful life of utility property, rates of depreciation, or capital expenditures, *see id.*, quoting *West v. Chesapeake & Potomac Tel. Co. of Baltimore City*, 295 U.S. 662, 689 (1935) (Stone, J., dissenting) (observing that a judicial determination of the value of a public utility's property casts "'courts . . . into the most speculative undertaking imposed upon them in the entire history of English jurisprudence' ").

{¶ 43} Without presenting any positive law that requires an appraiser to use or not use a particular valuation method, Rover's argument necessarily reduces to a request that we reweigh the appraisal evidence presented to the board, which is not our function. *See EOP-BP Tower*, 2005-Ohio-3096, at ¶ 9.

{¶ 44} We reject Rover's first proposition of law.

*B. Whether the board's adoption of Eyre's cost-approach valuation swept in value unrelated to the cost of constructing the pipeline (Rover's Proposition of Law No. 2)*

{¶ 45} In its second proposition of law, Rover takes aim at Eyre's cost-approach valuation, arguing that he swept in excess costs that have nothing to do with the true value of the pipeline. Rather than sweep in those costs, Rover insists, Eyre should have excluded them. We reject this proposition.

{¶ 46} The cost approach seeks to determine what a potential buyer would expect to pay in constructing a replacement for the existing property. *Dayton-Montgomery Cty. Port Auth. v. Montgomery Cty. Bd. of Revision*, 2007-Ohio-1948, ¶ 12. The idea underlying this approach is that "'[a] prospective purchaser will not rationally pay $15,000 for a house, or for 100 shares of stock, or for a shipment of wheat if, without serious delay, he can build or buy equally satisfactory substitutes for $10,000.'" (Bracketed text in original.) *Id.*, quoting 1 Bonbright, *The Valuation of Property*, 157 (1937).

{¶ 47} Eyre used the historical-cost-less-depreciation method, which assigns primacy to the property's cost at the time it was originally acquired or constructed and placed in service. Eyre used the information from FERC's regulatory forms to perform much of his analysis, supplementing it with information taken from Rover's public financial statements. To calculate a value, Eyre began by identifying the value of the "utility plant in service" and then adjusted for "accumulated depreciation and amortization," "construction work in progress," "plant materials and supplies," and "gas owed to system gas."

{¶ 48} After applying the cost approach, Eyre checked its reliability against a "market analysis," which entailed calculating a market-to-book ratio. Broadly speaking, Eyre strove in his market analysis to identify whether the value he opined under the cost approach, which he drew from "values on the books," should be adjusted in view of market data associated with companies in the natural-gas industry whose stock and debt securities are publicly traded. Based on his calculated market-to-book ratio, Eyre determined that no reduction in value was necessary.

{¶ 49} Rover maintains that Eyre tainted his approach by sweeping in what it calls "cost overruns" that added no value to the pipeline. These overruns, it says, consist of delays attributable to aberrant rainfall and the environmental incident caused by the release of drilling fluid. Because "freak weather events" do not speak

to the cost of constructing a substitute pipeline, the argument runs, such events would not confront a builder of a substitute pipeline. By the same logic, a substitute builder would not expect to be beset by environmental troubles.

{¶ 50} Viewed in isolation, Rover makes a fair point—a rational buyer of the pipeline would not assign value to the costs caused by aberrant weather and environmental mishaps because, ideally, those events would not happen. But pipelines are constructed in the real world, and, as the board found, "[t]he construction of an interstate natural gas pipeline covering hundreds of miles is a massive planning, financial, and logistical enterprise," BTA No. 2020-1540 at 8 (Mar. 7, 2024). Given the enormity of the undertaking, it follows that any number of unforeseen contingencies await a pipeline builder. Of course, it can be imagined that, unlike here, the builder would luck out with good weather and no environmental setbacks. But it can also be imagined that for all its good fortune in dealing with the weather and the environment, the builder would be plagued by unexpected labor and material shortages. Or perhaps the project would stall during construction because of protracted litigation associated with permitting. The point is that because the future is fraught with uncertainty, the prudent builder must incorporate a contingency into its budget to generate a realistic forecast of what the project will actually cost. This is where Rover's argument begins to flounder.

{¶ 51} As the board explained, if Rover's "budgeting process was faulty or incomplete, then what Rover called an overrun may be a technical or literal overrun *from the budget*, but not an overrun *from what should have properly been budgeted based on like or similar projects*." (Emphasis in original.) *Id.* at 132. Based on its review of the evidence, the board determined that it was "clear" that Rover's budget was "atypically small" and contained "shortcomings," *id.* at 133, that were not assignable as a "trifling bookkeeping mistake," *id.* at 134. The record amply supports this determination.

{¶ 52} According to Eyre's testimony at the board hearing, a report by Lummus Consultants, which Rover had hired, found that Rover's budgeted contingency of 1.3 percent was "low" and should have been at least 10 percent. Beth Hickey, who oversaw Rover in her capacity as executive vice-president of commercial operations for one of Rover's parent companies, testified that the contingency was "pretty small." And Eyre explained that even a 10 percent contingency would be low, testifying that he had seen budgets in the range of 35 to 50 percent for large construction projects and that Rover should have budgeted a contingency in that range because the pipeline crossed several jurisdictions and streams.

{¶ 53} Rover counters that even if it had applied a 10 percent contingency, its cost overruns still would have dwarfed the contingency. We presume that Rover is referring here to Reilly's calculations, which he took from Veritas Consulting. The problem with Rover's argument is that the board determined that the data compiled by Veritas was "unreliable," *id.* at 131, "lack[ed] support," *id.* at 127, and was "concern[ing]," *id.* at 134. Rover does not address the board's determinations vis-à-vis Veritas's calculation in its brief, so we take the board's determinations as we find them. Rover's reliance on *Standard Oil Co. v. Glander*, 155 Ohio St. 61 (1951), *rev'd on other grounds sub nom. Standard Oil Co. v. Peck*, 342 U.S. 382 (1952), does not alter the analysis. There, the taxpayer and the tax commissioner stipulated to this court that an "'overrun,' or excessive cost of construction," should be eliminated from the assessment. *Id.* at 78. In view of the stipulation, that decision supplies no binding rule to apply here.

{¶ 54} It is true that Eyre expressed some openness to the idea that at least some costs related to the April 2017 environmental incident could be written off as an expense rather than accounted for as a capital cost. But he testified that Rover itself reported the costs on forms it provided to FERC as a valid cost of construction by capitalizing the costs into its plant in-service account. The board found that

"Eyre was well within his expertise to opine on those forms." BTA No. 2020-1540 at 137 (Mar. 7, 2024). And Rover cites no authority that forbids an appraiser from using a cost approach to value based on information the pipeline's owner reported to FERC by Rover.

{¶ 55} The board also read *Dominion Resources, Inc. v. United States*, 219 F.3d 359 (4th Cir. 2000), as articulating support for the view that at least some of the costs of environmental cleanup should have been deducted as an expense rather than recognized as a capital cost. But the board was unable to make a firm determination regarding the amount of the deduction based on the information that Rover had reported to FERC. BTA No. 2020-1540 at 139 (Mar. 7, 2024).

{¶ 56} Without a clear rule of law to apply here, the issue once again boils down to the board's evaluation of the evidence. In seeking to undermine the board's rationale, Rover argues that it had "powerful incentives" to budget its costs accurately based on FERC's regulations. Rover further observes that had it included a larger contingency, FERC might have viewed the contingency as an overbudgeting ploy to increase its rates. At most, these arguments establish that the board could have evaluated the evidence differently, not that it abused its discretion in evaluating the evidence in the way that it did. *See Hilliard City Schools Board of Edn. v. Franklin Cty. Bd. of Revision*, 2018-Ohio-4282, ¶ 14.

{¶ 57} Rover's argument that Eyre erred in not separately deducting the cost overruns as unforeseen functional obsolescence is similarly flawed. This court has described functional obsolescence as "'a flaw in the structure, materials, or design of the improvement when compared with the highest and best use and most cost-effective functional design requirements at the time of appraisal.'" *Higbee Co. v. Cuyahoga Cty. Bd. of Revision*, 2006-Ohio-2, ¶ 52, quoting *The Appraisal of Real Estate* 403 (12th Ed. 2001). We further explained:

"Functional obsolescence is attributable to defects within the property . . . . Functional obsolescence, which may be curable or incurable, can be caused by a deficiency, which means that some aspect of the subject property is below standard in respect to market norms. It can also be caused by a superadequacy, which means that some aspect of the subject property exceeds market norms."

(Ellipses in original.) *Id.*

{¶ 58} Based on this description, the board rejected Rover's attempt to identify cost overruns under the rubric of functional obsolescence. BTA No. 2020-1540 at 128-129 (Mar. 7, 2024). We agree with the board's determination. Functional obsolescence speaks to a flaw in the property itself, such as a building containing inadequate electric wiring. *See* Adm.Code 5703-25-12 (defining functional obsolescence when valuing "buildings, structures, fixtures and improvements to land"). Rover's argument, however, pertains to external factors (i.e., weather and regulatory actions). And the record here does not contain evidence indicating that the pipeline is inferior or superior with respect to market norms.

{¶ 59} Rover also asserts that Eyre ignored the existence of functional obsolescence. Rover first challenges Eyre's determination that it was unnecessary to create a separate deduction for functional obsolescence because he had deducted depreciation based on the figures reflected on FERC's forms. Although Eyre's application of the cost approach does not contain an explicit line item denominated as "functional obsolescence," he testified before the board that FERC defines "depreciation" as encompassing obsolescence and that therefore, the deductions in

his report were proper. The board determined that Eyre's approach had logical and legal support but added that it was "at times unsatisfying."[2] *Id.* at 161.

{¶ 60} Rover questions Eyre's reliance on FERC's method of considering obsolescence under the umbrella of depreciation, arguing that because FERC is not charged with determining market value, the depreciation estimate that Eyre drew from FERC's form rested on different assumptions rooted in different purposes. But Rover fails to identify an authoritative text that forbids what Eyre did. For this reason, the board was left to assign the weight it thought appropriate to Eyre's handling of functional obsolescence. Because we are not a "super board of tax appeals," we do not reweigh the board's determination. *DAK, PLL v. Franklin Cty. Bd. of Revision*, 2005-Ohio-573, ¶ 16.

{¶ 61} Relatedly, Rover questions Eyre's statement that the appropriate method to measure obsolescence is to craft an income approach to value. Because Eyre opined a value under his application of the income approach that was $1 billion less than the value yielded by his application of the cost approach, Rover reasons, his application of the cost approach failed to account for massive obsolescence. Rover further insists that by averaging his cost-approach valuation with his income-approach valuation, Eyre corrupted his reconciled value, incorrectly skewing it upward by half a billion dollars. But Rover has failed to show that the board abused its discretion in assigning the weight it thought appropriate to place on Eyre's handling of obsolescence. *See Hilliard City Schools Bd. of Edn.*, 2018-Ohio-4282, at ¶ 14.

{¶ 62} Last, Rover faults Eyre for invoking the Western States Association of Tax Administrators handbook to support his view that it would be improper to

---

2. The board cites *PacifiCorp v. State*, 360 Mont. 259, ¶ 40-48 (2011), describing it as a decision in which the Supreme Court of Montana found that "it was not improper to rely on [FERC] depreciation to capture obsolescence," BTA No. 2020-1540 at 161 (Mar. 7, 2024). For an alternative view, see *PacifiCorp v. Idaho State Tax Comm.*, 153 Idaho 759, 768-769 (2012), which the board also discussed. Rover does not address either decision in its briefs.

deduct functional obsolescence under his application of the cost approach. Rover reasons that it was improper for Eyre to rely on the handbook because he cowrote it. But Rover provides no analysis to support this argument. The lack of "meaningful analysis to support [an] argument . . . is grounds alone to reject it." *Adams*, 2024-Ohio-4640, at ¶ 62.

### C. Whether the board erred in analyzing the effect of the Blackstone transaction (Rover's Proposition of Law No. 3)

{¶ 63} Rover's third proposition of law challenges the board's determination that the Blackstone transaction was an important guidepost in determining the pipeline's value. Rover divides its challenge into two subarguments. First, it claims that the transaction is an invalid datum to assist in establishing the pipeline's value because Blackstone purchased an indirect equity interest. Second, it asserts that, if anything, the transaction establishes a ceiling for valuing the pipeline. In simpler terms, the first subargument advances a qualitative claim regarding the character of the transaction, and the second advances a quantitative claim regarding the transaction's imputed value. Each is considered in turn below.

### 1. Indirect equity interest

{¶ 64} The board characterized the Blackstone transaction as a "very important clue but not dispositive evidence of value." BTA No. 2020-1540 at 109 (Mar. 7, 2024). In doing so, it determined that the "most credible testimony" analyzing the transaction came from Cornell, the tax commissioner's expert who testified that the transaction should be understood as creating a floor value with an upward range. *Id.* Rover maintains, however, that the transaction should not have been considered probative, because Blackstone acquired an indirect equity interest in Rover, not the pipeline itself. We are unconvinced.

{¶ 65} In support of this argument, Rover cites *Salem Med. Arts & Dev. Corp. v. Columbiana Cty. Bd. of Revision*, 1998-Ohio-248, and *Gahanna-Jefferson*

*Pub. Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 2000-Ohio-216. In *Salem*, this court determined that a company's stock price could not be used to establish the value of realty, because the "stock['s] price fails to account for the complexities of corporate finance." *Salem* at ¶ 10. Because "stock value represents the company's value," we reasoned that appraisal or expert accounting testimony was necessary to prove the value of the real property separate from the company's value. *Id.* at ¶ 11. A related issue involving the sale of partnership interests arose in *Gahanna-Jefferson*. There, this court concluded that because the sale of the partnership interest constituted the sale of personal property and not real property, the former could not be used to value the latter. *Gahanna-Jefferson* at ¶ 17. "[A]s we declared in *Salem*, other evidence can be used to prove the value of the real property separate from the partnership interests." *Id.* at ¶ 19.

{¶ 66} We revisited these two decisions in *Columbus City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 2020-Ohio-353 ("*Palmer House*"), a case involving the effect of what this court termed a "Drop Down LLC sale" on the value of an apartment complex. In *Palmer House*, a school board argued that the sale of the entity constituted the presumptive value of the real estate. But the owner, relying on *Salem* and *Gahanna-Jefferson*, argued that the sale of the entity could never be viewed as equivalent to a sale of the entity's real-estate asset. We observed that *Salem* and *Gahanna-Jefferson* announced a "broad principle," *Palmer House* at ¶ 35, but clarified that those two decisions did not establish an "iron rule," *id.* at ¶ 36. Rather than apply a categorical prohibition, we assigned primacy to the evidence presented to the board—specifically, a contract that "identifie[d] itself as a purchase agreement for the real estate at issue." *Id.* at ¶ 38. That evidence, we explained, furnished a basis for the board to reasonably conclude that that sale, unlike the sales at issue in *Salem* and *Gahanna-Jefferson*, reflected the contracting "parties' intent to sell and purchase income-producing real estate." *Id.* at ¶ 39.

{¶ 67} In this case, the board determined that its evaluation of the effect of the Blackstone transaction on the pipeline's value was "consistent" with *Palmer House*. BTA No. 2020-1540 at 115 (Mar. 7, 2024). We agree, but it is worth noting that in *Palmer House*, this court determined that the "Drop Down LLC sale" provided the key to achieving a direct valuation of the property. *See Palmer House* at ¶ 15, 50 (affirming the board's decision to value the property based on the sale price less the value of nontaxable personal property). Here, in contrast, the board did not directly value the pipeline based on the Blackstone transaction; instead, the transaction was used as a guidepost. Even so, *Palmer House* is instructive and clarifies that in a proper case, the sale of an income-producing property does not lose its character as such even if, as we termed it, other "assets" and "considerations" are included within the sale, *id.* at ¶ 40. Notwithstanding the presence of these other "assets" and "considerations" in *Palmer House*, import was placed on whether the real estate generated income, whether that income was integral to the value of the real property, and whether other income was derived from the real property that would relate to value beyond the real property, *id.* at ¶ 42. In our view, this case presents a similar situation.

{¶ 68} Recall that Blackstone paid $1.51 billion for a 49.9 percent interest in ET Rover Pipeline, thereby giving Blackstone a 32.435 percent indirect interest in Rover by way of ET Rover Pipeline's 65 percent interest in Rover. The board found persuasive Cornell's testimony addressing the transaction's significance. In Cornell's view, the Blackstone transaction implied that the true value of the pipeline as a whole was at least $4.66 billion, which he called a "floor," and which he calculated by dividing Blackstone's contribution of $1.510 billion by its 32.435 percent indirect interest in Rover. Cornell further observed that based on the calculations he had reviewed, the implied value could be extended "north[ward]" to "probably around $5 billion." According to Cornell, the transaction was a means for Blackstone to gain access to cash flows from the completed pipeline. Cornell

drew this conclusion based on his review of Rover's balance sheet, which showed that Rover's "overwhelming" asset "by several orders of magnitude" was the pipeline.

{¶ 69} As in *Palmer House*—and unlike in *Salem* and *Gahanna-Jefferson*—here, the board was thus presented with evidence that provided a reasonable basis for it to conclude that notwithstanding Blackstone's formal purchase of an equity interest in Rover's partial parent, the sale was, in substance, a means for Blackstone to acquire an interest in an income-producing property. Because the record provides support for the board's view that the "value purchased by Blackstone was tied to the hard assets" of the pipeline, BTA No. 2020-1540 at 114 (Mar. 7, 2024), and that the pipeline was "the only asset of meaningful value," *id.* at 119, there is no merit to Rover's argument that nontaxable assets should have been excluded.

{¶ 70} Rover argues that a member of Blackstone's dealmaking team—who had a more expansive conception of Rover's assets—presented unrebutted testimony that Blackstone's purchase of its interest in Rover's assets included "other, non-taxable assets." But the board found that the evidence on this point was in conflict, and it is the board's job, not ours, to resolve evidentiary conflicts. *See Buckeye Terminals, L.L.C. v. Franklin Cty. Bd. of Revision*, 2017-Ohio-7664, ¶ 14, 31 (evidentiary conflicts present a matter for the board to weigh). Similarly, the board did not find that the Blackstone member testified that Rover held assets other than those integral to the pipeline's operation. BTA No. 2020-1540 at 119 (Mar. 7, 2024). In any event, Rover fails to specify the value of these apparently nontaxable assets in terms of dollars, thereby reinforcing the board's finding that no value is accounted for beyond that of the pipeline. *See St. Bernard Self-Storage, L.L.C. v. Hamilton Cty. Bd. of Revision*, 2007-Ohio-5249, ¶ 25 (because the taxpayer "failed to prove the existence of any business value separable from the

value of the real property, the allocation to goodwill simply did not pertain to any such separable value").

{¶ 71} Nor does Rover succeed in downplaying *Palmer House* as turning on "idiosyncratic" facts by way of a structured sale involving a "Drop Down LLC." That characterization is mistaken—what mattered in that case was that the board was presented with a reasonable basis for it to conclude that the parties' intent in conducting the transaction was to transfer income-producing real estate. The board had a similar basis here regarding the pipeline.

{¶ 72} Last, Rover gets no traction in pointing to *Arbors E. RE*, 2018-Ohio-1611, which involved the transfer of a nursing-home facility. There, this court stressed that because such facilities conduct general-business activity and real-estate activity, the two must be kept separate when valuing only the real estate. *Id.* at ¶ 19. Here, in contrast, there is but one income-producing activity, and that activity traces directly to the pipeline. *See Palmer House* at ¶ 41-42 (finding the logic of *Arbors E. RE* inapt for this reason).

### *2. Ceiling or floor*

{¶ 73} Rover's second subargument in support of its third proposition of law maintains that if the Blackstone transaction is probative of anything, it is that the transaction establishes a ceiling rather than a floor on the pipeline's value. We disagree.

{¶ 74} Rover says that the Blackstone transaction can be considered (1) the functional equivalent of a bulk sale or (2) a sale of the pipeline itself. If the Blackstone transaction is considered a bulk sale, Rover reasons, then the imputed price of $4.66 billion cannot rise further, because, the argument runs, the value of one piece of property within a bulk sale cannot exceed the price of the sale. If the Blackstone transaction is considered a sale of the pipeline itself, Rover asserts, then the imputed price of $4.66 billion cannot rise further, because the sale of the pipeline is the best evidence of value.

**{¶ 75}** In a bulk-sale case, the best evidence of true value is the properly allocated price from a recent arm's-length sale. *Conalco, Inc. v. Monroe Cty. Bd. of Revision*, 50 Ohio St.2d 129 (1977), paragraphs one and two of the syllabus; *St. Bernard Self-Storage*, 2007-Ohio-5249, at ¶ 15 ("Unlike a simpler transaction where a single parcel of real property is sold individually, a bulk sale may involve the sale of all the assets of a business, whereby a parcel of real property constitutes one of many business assets sold at the same time for an aggregate sale price."). Outside the bulk-sale realm, the principle is functionally the same for the sale of a discrete piece of property—the price from a recent arm's-length sale is the best evidence of the property's value, *Grabler Mfg. Co. v. Kosydar*, 43 Ohio St.2d 75, 77-78 (1975). These principles stand for the idea that "[i]n some cases, a recent arm's-length sale furnishes a *direct indication of value . . . .*" *Rich's Dept. Stores, Inc. v. Levin*, 2010-Ohio-957, ¶ 26 (declining to apply the principle because the taxpayer had not shown evidence of a bulk sale).

**{¶ 76}** Here, the board did not use the Blackstone transaction to *directly* value the pipeline. The board's wariness of doing so can be explained at least in part by the fact that at the time of the transaction, the pipeline was partially complete. When a property undergoes improvements between the time of the sale and the tax-lien date, as here, a finding of recency becomes difficult to sustain. *See Cummins Property Servs., L.L.C. v. Franklin Cty. Bd. of Revision*, 2008-Ohio-1473, ¶ 35, *superseded by statute as stated in Rancho Cincinnati Rivers, L.L.C. v. Warren Cty. Bd. of Revision*, 2021-Ohio-2798, ¶ 25. Similarly, this court has observed that in bulk-sale cases, which is the characterization that Rover leans most heavily on, "'complexities of the sale' may justify looking to appraisal evidence rather than the sale price to value the property," *Cincinnati School District Bd. of Edn. v. Hamilton Cty. Bd. of Revision*, 2017-Ohio-7650, ¶ 11. That the board rendered a 165-page decision in this case attests to the complexities attending the value question.

**{¶ 77}** Rather than using the Blackstone transaction to directly value the pipeline, the board saw it as establishing a guidepost, containing "useful market information" to check the reliability of the opinions of value advanced in this case. BTA No. 2020-1540 at 108 (Mar. 7, 2024). That approach was perhaps unorthodox, but we find no legal error in the board's doing what it did. The board's task here, as Rover agrees, was to find the pipeline's true value. Rover points to nothing in the language of R.C. Ch. 5727 that forbids the board's guidepost-as-a-check approach. And it is not our role to announce a judge-made prohibition not prescribed by law. *See Wheeling Steel Corp. v. Porterfield*, 24 Ohio St.2d 24, 27-28, (1970). Consequently, the validity of the board's handling of the transaction turns largely on its assessment of the evidence.

**{¶ 78}** The board viewed Cornell's testimony regarding the Blackstone transaction as the "most credible," noting that he saw the transaction as creating a floor with an upward range. BTA No. 2020-1540 at 109 (Mar. 7, 2024). Cornell's floor-with-an-upward-range description rests on two ideas. First, he explained that Blackstone was investing in a completed pipeline, not a development partner, though the pipeline was not yet complete at the time of the transaction. At the time of the transaction, which took place in July 2017, the pipeline was still being constructed. It was not until November 2018, one month before the December 31, 2018 tax-lien date, that the pipeline was completed and available for full commercial operation. In light of the improvements made to the pipeline from the time of the Blackstone transaction to the tax-lien date, the board's determination that the pipeline's value had a floor with an upward range is amply supported. Indeed, the point of this case is to determine the value of the pipeline as of the tax-lien date. Given that the pipeline only increased in value as the tax-lien date approached, Rover's view that the transaction established a ceiling on the pipeline's value roughly a year and a half before the tax-lien date is not convincing.

{¶ 79} Cornell's second reason for viewing the transaction as creating a floor with an upward range rests on Blackstone's purchase of what he termed in his expert report an "indirect, minority, illiquid interest." Cornell cited academic studies finding that "minority, illiquid interests frequently trade at discounts to the true value of the entire property." As he explained before the board, "[c]ontrol has value." Cornell discerned that in the 50.1/49.9 percent ownership split between ET Rover and Blackstone, ET Rover negotiated for control and, in doing so, was willing to give Blackstone a discount on its minority ownership stake.

{¶ 80} Rover faults Cornell's minority-interest rationale, claiming that it contradicts the board's precedent on transfers of fractional interests. Not so. Under the board's precedent, the validity of which is unquestioned in this appeal, a sale of a fractional interest may serve as a probative indicator of value provided that it is considered and tested against other evidence of value. *See, e.g.*, *Roc Syl Assocs. v. Cuyahoga Cty. Bd. of Revision*, BTA Nos. 2008-A-1390, 2008-A-1391, and 2009-A-836, 2011 WL 3561194, *3 (Aug. 9, 2011) (collecting cases). The board did precisely this. Paragraph after paragraph of the board's decision assesses the Blackstone transaction, Reilly's opinion of value, and Eyre's opinion of value. And the board found that the Blackstone transaction supported Eyre's appraisal. BTA No. 2020-1540 at 123-124, 164 (Mar. 7, 2024).

{¶ 81} We reject Rover's third proposition of law.

*D. Whether the board erred by adopting Eyre's appraisal notwithstanding its identification of alleged errors (Rover's Proposition of Law No. 4)*

{¶ 82} In its fourth proposition of law, Rover argues that the board erred by adopting Eyre's valuation despite identifying what Rover calls "legal errors" in his analysis. First, Rover points to the board's statement that it found "unsatisfying" Eyre's view that "'in theory,' regulatory depreciation should capture obsolescence," *id.* at 161. Second, Rover emphasizes that the board "fault[ed]" Eyre for not doing a more thorough analysis of the Blackstone transaction in his

written report, *id.* at 110.  In view of these alleged errors, Rover says that at a minimum, this court should vacate the board's decision and remand the case with instructions that the board render an independent determination of value or, alternatively, direct the tax commissioner to do so.  We are unpersuaded.

{¶ 83} In the real-property-valuation context, we have said that the board "is not required to adopt the appraisal methodology espoused by any expert or witness." *Hotel Statler v. Cuyahoga Cty. Bd. of Revision*, 1997-Ohio-388, ¶ 19. That precept has special force here, Rover argues in its merit brief, because the board "determined that *none* of the testifying appraisers correctly determined true value." (Emphasis in original.)  On Rover's telling, because the board found that no appraiser correctly did his job, the board was required to independently find value or direct the tax commissioner to do so—not select what it viewed to be, in Rover's words, the "least flawed" appraisal, as an arbitrator would do in a "baseball arbitration." *See, e.g.*, *Rain CII Carbon, L.L.C. v. ConocoPhillips Co.*, 2011 WL 2565345, *1 (E.D. La. Jun. 27, 2011) (observing that in a baseball arbitration, each party submits a proposal and the arbitrator selects one of the two).  In support of this argument, Rover cites, among other decisions, *Cincinnati Milacron Industries, Inc. v. Brown Cty. Bd. of Revision*, in which this court observed that the board is permitted "to render its own independent decision as to the valuation of the property in issue," 35 Ohio St.3d 32, 33 (1988), citing R.C. 5717.03.

{¶ 84} Rover puts words in the board's mouth by saying that the board characterized Eyre's appraisal as containing "legal errors."  The board's decision plainly conveys that the board viewed Eyre's appraisal as constituting the "best" evidence of value, BTA No. 2020-1540 at 164 (Mar. 7, 2024)—not, as Rover says, the "least flawed."  What is more, as to the first alleged error, Rover's merit brief conveys a misleading impression of what the board said.  Rover quotes a portion of the board's statement in which it found "unsatisfying" Eyre's view that "'in theory,' regulatory depreciation should capture obsolescence."  But Rover fails to quote the

immediately following clause, in which the board found that there was "logical and legal support for [Eyre's] idea," *id.* at 161. Turning to the second alleged error, while true that the board stated that it would have preferred that Eyre had analyzed the Blackstone transaction in his written appraisal report, it is also true that Eyre testified that he viewed the transaction as reflecting a value of at least $4.8 billion and that the board viewed that testimony as "valid" for its consideration, *id.* at 164.

{¶ 85} By Rover's logic, Eyre apparently had to render a perfect appraisal to justify the board's adoption of his appraised value. But this court has not held the board to so high a standard. *See Hilliard City Schools Bd. of Edn.*, 2018-Ohio-4282, at ¶ 14 (affirming order in which the board adopted an appraiser's opinion of value containing "alleged weak points" rather than another appraiser's opinion of value, which the board found less probative); *Health Care REIT, Inc. v. Cuyahoga Cty. Bd. of Revision*, 2014-Ohio-2574, ¶ 58 (lead opinion) (characterizing an appraiser's valuation as "somewhat perplexing" but affirming the board's order adopting the valuation because the challenger had not shown that the board erred in rejecting the valuation proposed by the challenger's appraiser).

{¶ 86} Given the complexities this case entails, it is hardly surprising that the board was able to identify blemishes on Eyre's appraisal. That the board was able to do so is not evidence that the board erred in adopting his opined value, because analytical perfection by an appraiser is not the touchstone for analysis. Indeed, it is well understood that property appraisal "'is incapable of mathematical precision and implicates methods of judgment.'" *United States v. 0.376 Acres of Land*, 838 F.2d 819, 825 (6th Cir. 1988), quoting *United States v. 1,378.65 Acres of Land*, 794 F.2d 1313, 1318-1319 (8th Cir. 1986); *see also United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996), quoting *United States v. 68.94 Acres of Land*, 918 F.2d 389, 393 (3d Cir. 1990) ("'there are no infallible means for determining with absolute conviction what a willing buyer would have paid a willing seller'"); *Latimore v. Citibank Fed. Savings Bank*, 151 F.3d 712, 715 (7th

Cir. 1998) ("appraisal is not an exact science"); *In re Bate Land & Timber L.L.C.*, 877 F.3d 188, 197 (4th Cir. 2017) ("[v]aluation is not an exact science" [cleaned up]).

{¶ 87} We reject Rover's fourth proposition of law.

### III. CONCLUSION

{¶ 88} Accordingly, we affirm the board's decision.

Decision affirmed.

———————————

Gibson, Dunn & Crutcher, L.L.P., Jonathan C. Bond, and Sanford W. Stark; Zaino Hall & Farrin, L.L.C., Stephen K. Hall, Thomas M. Zaino, Richard C. Farrin, and Robert C. Maier; and Norton Rose Fulbright and Andrew P. Price, for appellant.

Dave Yost, Attorney General, T. Elliot Gaiser, Solicitor General, and Samantha L. Cowne, Assistant Attorney General, for appellee.

Steptoe and Johnson, L.L.P., John Kevin West, Timothy M. McKeen, and John C. Ferrell, urging reversal for amici curiae Ohio Oil & Gas Association and Ohio Manufacturers' Association.

Calfee, Halter & Griswold, L.L.P., James F. Lang, and Matthew B. Barbara, urging reversal for amicus curiae Ohio Chamber of Commerce.

Bricker Graydon, L.L.P., Brodi J. Conover, and Rebecca C. Princehorn, for amici curiae Napoleon Area City School District, Henry County; Cindy Funk, Ashland County Auditor; Cindi Henry, Belmont County Auditor; Lynn Fairclough, Carroll County Auditor; Robyn Sheets, Crawford County Auditor; Jill Little, Defiance County Auditor; Brett Kolb, Fulton County Auditor; Charity Rauschenberg, Hancock County Auditor; Allison Anderson, Harrison County Auditor; Elizabeth Fruchey, Henry County Auditor; E.J. Conn, Jefferson County Auditor; Denise Stoneking, Monroe County Auditor; Ruth Hayes, Noble County Auditor; Patrick Dropsey, Richland County Auditor; Julie Adkins, Seneca County

Auditor; Alan Harold, Stark County Auditor; Larry Lindberg, Tuscarawas County Auditor; Russell Robertson, Wayne County Auditor; Matt Oestreich, Wood County Auditor; Buckeye Association of School Administrators; Ohio Association of School Business Officials; Ohio School Boards Association; Ohio Prosecuting Attorneys Association; Ohio Township Association; and Ohio Library Council.

_____