[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *RiverSouth Auth. v. Harris*, Slip Opinion No. 2026-Ohio-2396.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2026-OHIO-2396

RIVERSOUTH AUTHORITY, APPELLANT, *v.* HARRIS, TAX COMMR., ET AL., APPELLEES.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *RiverSouth Auth. v. Harris*, Slip Opinion No. 2026-Ohio-2396.]**

*Taxation—Real property—Charitable-use exemption—R.C. 5709.08(A)(1) and 5709.121(A)(2)—Board of Tax Appeals improperly affirmed tax commissioner's final determination based on new issue without complying with remand procedure under R.C. 5717.03(G)—City's hiring of management company to operate day-to-day activities of parking garage did not override city's direction and control of public property—City is entitled to exemption under R.C. 5709.121(A)(2) for garage used exclusively for public purposes—Board of Tax Appeals' decision reversed and cause remanded.*

(No. 2025-0671—Submitted February 11, 2026—Decided June 26, 2026.)

APPEAL from the Board of Tax Appeals, No. 2021-1784.

_____

SHANAHAN, J., authored the opinion of the court, which KENNEDY, C.J., and FISCHER, DEWINE, DETERS, HAWKINS, and SHANAHAN, JJ., joined. BRUNNER, J., concurred in part and dissented in part and would remand the cause to the tax commissioner for her to conduct the remaining analysis under R.C. 5709.121(A)(2) and, because the fourth proposition of law is dispositive, would not consider the first proposition of law.

**SHANAHAN, J.**

{¶ 1} This is a real-property-tax-exemption case. At issue is the taxable status of a roughly 600-space parking garage located in the City of Columbus that is situated on the Scioto Peninsula near the Center of Science and Industry (commonly known as "COSI"). Appellant, RiverSouth Authority ("RiverSouth"), which exists as a "new community authority" and a "body corporate and politic" under R.C. 349.05, seeks an exemption for the garage under R.C. 5709.08(A)(1) on the ground that the garage is public property used exclusively for a public purpose. RiverSouth owns the garage and leases it to the city, and that relationship is affected by two management agreements that are relevant to this case. The first agreement is between the city and a private, nonprofit entity, and it designates the latter as the garage's manager. The second agreement, which was executed after the first, is between the nonprofit entity and a private, for-profit entity, and it designates the latter as the garage's operator.

{¶ 2} Appellee Patricia Harris, the tax commissioner of Ohio, denied the exemption because of the private, for-profit entity's involvement with the garage. The Board of Tax Appeals affirmed, but in its view, the private, for-profit entity's involvement with the garage was not the problem. Rather, notwithstanding the absence of adversarial briefing on the question, the board sua sponte determined

2

that the private, nonprofit entity's involvement with the garage justified denying the exemption.

{¶ 3} RiverSouth appeals, raising the following four propositions of law.

Proposition of Law No. 1: The Board acts unreasonably and unlawfully in affirming the Tax Commissioner's Final Determination on a basis that was not raised by the Tax Commissioner in her Final Determination and was never communicated to the Taxpayer and was therefore waived by the Tax Commissioner.

Proposition of Law No. 2: RiverSouth was denied due process because it was not afforded an opportunity to be heard at a meaningful time and in a meaningful manner.

Proposition of Law No. 3: Real property owned by a political subdivision and leased to another political subdivision that is used exclusively for public purposes is exempt from taxation pursuant to R.C. 5709.08(A)(1).

Proposition of Law No. 4: The owner or lessee of property who hires a management company to operate the day-to-day activities of the property retains direction or control of the property.

{¶ 4} We address the propositions of law out of order and turn our attention to the first and fourth propositions of law. Our resolution of these two propositions makes it unnecessary for us to consider the other two propositions of law. We vacate the board's decision and remand the case to the tax commissioner to issue the exemption order and calculate the refund owed to RiverSouth.

## I. BACKGROUND

### A. The agreements

{¶ 5} The facts of this case are undisputed and are based on a collection of agreements associated with the garage, which currently sits on property that the city acquired by quitclaim deed in January 1989.

{¶ 6} The first relevant agreement was executed in September 2016, and under that agreement, the city leased a 6.34-acre portion of its property to RiverSouth by way of a 40-year ground lease. "A 'ground lease' is a 'lease that grants the right to use and occupy land.'" *N. Royalton City School Dist. Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision*, 2011-Ohio-3092, ¶ 1, fn. 1, quoting American Institute of Real Estate Appraisers, *The Dictionary of Real Estate Appraisal* (1984). The ground lease identifies the leased portion of the property as the "project site" and contemplates the construction of an "approximately 600-space underground public parking garage" on it. The ground lease provides that RiverSouth owns the "buildings, improvements, fixtures, machinery and equipment"—relevant here, the garage—constructed on the project site for the duration of the ground lease, but it clarifies that RiverSouth was required, in accordance with a master lease, to lease the "buildings, improvements, fixtures, machinery and equipment"—again, the garage—to the city. The master lease spells out, among other things, RiverSouth's responsibility for financing and constructing the garage. Under the terms of the ground lease, the city was required, upon request, to help RiverSouth secure a real-property-tax exemption as to the leased portion encompassed by the project site, but the city was not responsible for paying any real-property taxes imposed on the project site.

{¶ 7} The city and RiverSouth went on to execute a first supplemental lease, in which RiverSouth agreed to issue bonds[1] to finance a portion of the garage's

---

1. Under R.C. 349.08, a "new community authority"—as RiverSouth is here—"may, from time to time, issue community authority bonds . . . ."

construction costs, and a second supplemental lease, in which the city was authorized to "engage one or more operators experienced in managing and/or operating parking facilities to perform some or all of its obligations." Under the terms of the second supplemental lease, the city has the "sole and exclusive right, license and privilege to use and occupy" the garage.

{¶ 8} In October 2017, the city and Capitol South Community Urban Redevelopment Corporation ("Capitol South"), a private, nonprofit entity, executed a management agreement that granted Capitol South the right to manage and operate the garage. Under that agreement, the garage was to be "managed with a goal of providing affordable parking for downtown employees, guests and residents." The agreement authorized Capitol South to engage one or more operators to perform some or all of Capitol South's obligations under the agreement. To this end, in November 2017, Capitol South and LAZ Parking Midwest, L.L.C. ("LAZ"), a private, for-profit entity, executed a parking-garage-operation agreement whereby Capitol South "hire[d] [LAZ] to operate the parking garage." That agreement recognizes that the garage is "controlled by the City."

*B. Proceedings before the tax commissioner*

{¶ 9} In January 2019, RiverSouth filed an application requesting that the garage be exempted from real-property taxation. In accordance with R.C. 5715.27(B)(1), the tax commissioner notified appellee Board of Education of the Columbus City School District of RiverSouth's request, and the school district thereafter notified the tax commissioner and RiverSouth that it objected to the exemption request.

{¶ 10} In its application, RiverSouth stated that the garage's exempt use began on January 1, 2018, and it cited R.C. 5709.08 and 5709.121 as the bases for its exemption request. Under R.C. 5709.08(A)(1), "public property used exclusively for a public purpose[] shall be exempt from taxation." And under R.C. 5709.121(A), "[r]eal . . . property belonging to . . . a political subdivision[] shall be

considered as used exclusively for . . . public purposes by such . . . political subdivision, if it meets" one of several specified requirements. This court has explained that R.C. 5709.121 "does not itself grant an exemption" but "merely sets forth certain situations in which real . . . property belonging to . . . a political subdivision may be considered as used exclusively for . . . public purposes." *First Baptist Church of Milford, Inc. v. Wilkins*, 2006-Ohio-4966, ¶ 16.

{¶ 11} In this case, the tax commissioner's final determination does not specify which division of R.C. 5709.121 she considered, but it is clear from her analysis that she found division (A)(2) most apt. R.C. 5709.121(A)(2) provides:

> (A) Real . . . property belonging to . . . a political subdivision, shall be considered as used exclusively for . . . public purposes by such . . . political subdivision, if it meets one of the following requirements:
>
> . . .
>
> (2) It is made available under the direction or control of such . . . political subdivision for use in furtherance of or incidental to its . . . public purposes . . . and not with the view to profit.

{¶ 12} The tax commissioner stated that the operational agreement with for-profit LAZ was not contemplated under R.C. 5709.121. Additionally, the tax commissioner determined that because control and management of the garage was left in the hands of LAZ, the garage "los[t] its identity as public property used exclusively for a public purpose," as contemplated by R.C. 5709.08.

*C. Proceedings before the board*

{¶ 13} RiverSouth appealed to the board. All parties waived an evidentiary hearing, choosing instead to submit exhibits and written arguments.

6

**{¶ 14}** The board decided the case based on the guidance set forth in *Cincinnati v. Testa*, 2015-Ohio-1775. There, this court derived a three-part test from R.C. 5709.121(A)(2)'s language, saying that to qualify under that division, the property must be (1) under the direction or control of the political subdivision, (2) used in furtherance of or incidental to the political subdivision's public purposes, and (3) made available to others without a view to profit. *Cincinnati* at ¶ 20-22.

**{¶ 15}** In the board's view, RiverSouth's exemption request foundered on the test's first element. The board agreed with RiverSouth that LAZ's operation of the property did not defeat the exemption, thereby rejecting the rationale articulated in the tax commissioner's final determination. But the board nevertheless determined that the property was ineligible for an exemption because it appeared to the board to be under Capitol South's direction and control. The board found it significant that Capitol South was responsible for the garage's operation, maintenance, protection, and repair and for establishing the garage's days and times of operation and parking rates. The board found no evidence indicating that the city or RiverSouth routinely drove around the property (presumably for inspections). The board also highlighted the fact that funds were deposited in Capitol South's account and that Capitol South was responsible for maintaining the garage's accounting books and used the garage's receipts to pay for operating expenses consistent with the garage's annual budget. In the end, the board found "no indication that [the city] was involved in making management decisions or providing . . . ongoing oversight" over Capitol South. BTA No. 2021-1784, 2025 WL 1646249, *3 (Apr. 18, 2025).

**{¶ 16}** RiverSouth then filed this appeal.

## II. ANALYSIS

**{¶ 17}** This court reviews a decision of the board to determine whether it is reasonable and lawful. *Adams v. Harris*, 2024-Ohio-4640, ¶ 23; R.C. 5717.04.

"[L]egal issues are subject to de novo review, . . . but issues relating to the credibility of witnesses and the weighing of the evidence are subject to abuse-of-discretion review." *Rover Pipeline, L.L.C. v. Harris*, 2025-Ohio-2806, ¶ 27. This court "appl[ies] the same rules of construction to tax statutes that [it] appl[ies] to all other statutes," namely, by providing a "fair reading [to] what the legislature has enacted." *Stingray Pressure Pumping, L.L.C. v. Harris*, 2023-Ohio-2598, ¶ 22; *see also id.* at ¶ 19-22 (disavowing the tenet that tax-exemption statutes must be strictly construed against the taxpayer).

### A. First proposition of law

{¶ 18} In its first proposition of law, RiverSouth argues that the board erred when it affirmed on a ground that differed from the one espoused in the tax commissioner's final determination. That is, RiverSouth asserts that the board erred in pointing to Capitol South's involvement with the garage in affirming the tax commissioner's final determination when the tax commissioner pointed to LAZ's involvement with the garage in denying RiverSouth's exemption request.

{¶ 19} RiverSouth argued in its brief submitted to the board that LAZ's involvement with the garage was not a proper ground to deny the exemption. The board sua sponte raised the issue concerning Capitol South's involvement with the garage and decided the issue of RiverSouth's exemption request based on that issue. RiverSouth argues that because it did not receive notice that the alternative ground was at issue before the board, it had no opportunity to present a defense against this alternative ground. RiverSouth seeks reversal of the board's decision upholding the tax commissioner's denial of the exemption and seeks an order granting the exemption because the board rejected the only grounds on which the tax commissioner denied the exemption.

{¶ 20} We agree that the board overstepped by sua sponte raising a new issue and then affirming the tax commissioner's final determination based on that

new issue without complying with the remand procedure set forth in R.C. 5717.03(G).[2]

*B. Fourth proposition of law*

{¶ 21} RiverSouth's fourth proposition of law puts the substance of the board's decision squarely before us. It claims that under R.C. 5709.121(A)(2), the owner or lessee of property that hires a management company to operate the day-to-day activities of the property retains direction or control of the property. In RiverSouth's view, the board's determination that the garage was under the direction and control of Capitol South cannot be squared with this court's decision in *Cincinnati*, 2015-Ohio-1775. RiverSouth asserts that applying *Cincinnati*, the garage is under the direction and control of the city.

{¶ 22} In *Cincinnati*, the tax commissioner argued that the city's contract with a private, for-profit contractor to manage and operate city-owned, public golf courses defeated the city's request for a real-property-tax exemption for the golf courses. In deciding the issue, this court looked to R.C. 5709.121(A)(2) for guidance and construed the provision as setting forth three elements that had to be satisfied before a property was entitled to tax exemption. *Cincinnati* at ¶ 20. Relevant here is the first element, requiring that the property be under the direction or control of a political subdivision, *id.*; R.C. 5709.121(A)(2). This court determined that the golf courses were under the city's direction and control notwithstanding the city's management contract with the contractor, observing that the city retained authority over rate-setting, approval of marketing, and hours of

---

2. Under R.C. 5717.03(G), "[i]f the board finds that issues not raised on the appeal are important to a determination of a controversy, the board may remand the cause for an administrative determination and the issuance of a new . . . determination . . . ." Capitol South's involvement with the property presented a question that was not raised by the parties. The board decided the case based on that previously unraised issue rather than following the procedure set forth in the statute.

operation and that city employees inspected the courses almost daily. *Cincinnati* at ¶ 20.

{¶ 23} Turning to this case, the question is whether it was error for the board to determine that the property was under the "direction or control," R.C. 5709.121(A)(2), of Capitol South rather than the city. Whether the garage was under the direction or control of the city in view of the undisputed facts is a question of law this court reviews de novo, *Cincinnati* at ¶ 13, 15.

{¶ 24} We now consider the management agreement between the city and Capitol South.

{¶ 25} *Operation, maintenance, protection, and repair*. The board found it significant that Capitol South was responsible for the operation, maintenance, protection, and repair of the garage. But it ignored the term in the management agreement requiring that Capitol South discharge these responsibilities in such a way as to ensure that the city met its obligations under its second supplemental lease with RiverSouth and the term requiring Capitol South to obtain city approval for emergency-repair and operating expenses over a certain monetary threshold. By these terms in the agreement, the city retained direction or control over the operation, maintenance, protection, and repair of the garage.

{¶ 26} *Days and hours of operation and parking rates*. The board highlighted Capitol South's responsibility to establish the garage's days and hours of operation and its parking rates. But as to the former, the board overlooked the term in the management agreement requiring Capitol South to make the garage reasonably available for use by members of the public. And as to the latter, the board neglected to mention the term in the agreement making the parking rates established by Capitol South subject to the city's financing requirements. Both terms indicate the city's direction or control over the garage.

{¶ 27} *Deposit of receipts*. The board emphasized that gross receipts collected at the garage were to be deposited in Capitol South's bank account, but it

overlooked the terms in the management agreement requiring that the bank in which the receipts were to be deposited had to be reasonably acceptable to the city, that the account had to be established in the name of Capitol South as a fiduciary of the city, and that Capitol South could use the receipts solely for the payment of its management fee, operating expenses, and distributions to the city. By including these terms in the agreement, the city ensured that it would have direction or control over the garage's cashflow.

{¶ 28} *Budgeting*. The board pointed out that Capitol South used the parking receipts to pay for operating expenses consistent with the garage's annual budget. But under the terms of the management agreement, Capitol South had to submit the annual budget to the city's auditor and director of finance and management; make itself reasonably available before the start of each calendar year to discuss the city's questions or concerns regarding the budget; and during the course of the calendar year, notify the city of any material differences between the budget and the actual expenses or revenues. In addition, Capitol South had to ensure that LAZ submitted a five-year budget to the city.[3] These terms show the city's direction or control over the garage's budget.

{¶ 29} *Inspections*. The board observed that Capitol South was required under the management agreement to provide the city with access to the garage and some space in the garage to store maintenance equipment and vehicles, but the board faulted the city for failing to show that its employees routinely drove around the property. It is true that in *Cincinnati*, 2015-Ohio-1775, at ¶ 20, this court

---

3. In their merit briefs, the parties discuss the parking-garage-operation agreement between Capitol South and LAZ. The tax commissioner and the school district assert that LAZ's involvement with operating the garage is further evidence that the garage is not under the direction or control of the city, but they ignore the clause in the agreement whereby LAZ "acknowledges that the Premises are controlled by the City of Columbus and subject to an agreement between the City and Capitol South and agrees to follow Capitol South's directives in the operation of the Premises . . . ." In other words, notwithstanding the parking-garage-operation agreement between Capitol South and LAZ, the city remained in control of the garage.

pointed to the political subdivision's daily inspections as evidence of its direction and control over the property. But nothing in that decision suggests that daily inspections by a political subdivision must take place, much less that daily inspections are the sole indicia of direction and control. And the management agreement provides that Capitol South had to, among other things, keep the garage, sidewalks, and driveways free of snow and ice, maintain plantings and landscaping, and otherwise keep the garage in good condition. At bottom, even if the city did not perform daily inspections, it nevertheless had direction or control over the garage's upkeep by way of the aforementioned quality-assurance terms in the agreement.

{¶ 30} *Maintenance of the accounting books*. The board emphasized that Capitol South was responsible for maintaining the garage's accounting books. This is true, but the board overlooked that under the management agreement, the city had the right during regular business hours and upon reasonable notice to inspect and copy all records and conduct audits of all financial records and statements. Moreover, under the agreement, Capitol South had to maintain the books in accordance with generally accepted accounting principles and, within the first 90 days of each calendar year, had to give the city an accounting, in reasonable detail, of the operations of the garage during the preceding calendar year. It thus can fairly be said that the city exerted a measure of direction or control over the maintenance of the garage's books.

{¶ 31} In sum, we agree with RiverSouth's argument under its fourth proposition of law that the city continued to have direction or control of the property. We therefore vacate the board's decision and remand the case to the tax commissioner to issue the exemption order and calculate the refund owed to RiverSouth.

12

## III. CONCLUSION

{¶ 32} The board's decision denying RiverSouth's exemption request based on Capitol South's involvement with the property is vacated. The case is remanded to the tax commissioner to issue the exemption order and calculate the refund owed to RiverSouth.

Decision vacated
and cause remanded.

————————————

Zaino Hall & Farrin, L.L.C., Richard C. Farrin, and Thomas M. Zaino; and Zeiger, Tigges & Little, L.L.P., and John W. Zeiger, for appellant.

D. Andrew Wilson, Attorney General, and Daniel G. Kim and Christine L. Staab, Assistant Attorneys General, for appellee Tax Commissioner Patricia Harris.

Rich & Gillis Law Group, L.L.C., and Richelle Thoburn Ford, for appellee Board of Education of the Columbus City School District.

————————————